**In re MONUMENT RECORD CORPORATION, Debtor.**

**Bankruptcy No. 383–00747.**

United States Bankruptcy Court, M.D. Tennessee.

June 5, 1986.

———

James R. Kelley, James E. Zwickel, Dearborn & Ewing, Nashville, Tenn., for Roy Orbison.

Kevin Jones, Nashville, Tenn., for Monument Record Corp.

Bradley MacLean, Nashville, Tenn., for Hooker Hancock.

Russell H. Hippe, Jr., Nashville, Tenn., for FDIC.

William Lamar Newport, Nashville, Tenn., for the Unsecured Creditors Committee.

## MEMORANDUM

KEITH M. LUNDIN, Bankruptcy Judge.

The issue presented is whether a recording contract is an "executory contract" within the meaning of 11 U.S.C. § 365 (1982 ed., Supp. II 1984) where by subsequent agreement the parties have terminated the performer's obligations and the record company's only remaining responsi-

bility is to pay royalties. I hold that this "terminated" recording contract has been fully performed by one party and is no longer executory.

The following constitute findings of fact and conclusions of law. Bankruptcy Rule 7052. This is a core proceeding. 28 U.S.C. § 157(b)(2)(A) and (O) (1982 ed., Supp. II 1984).

## I.

The debtor produces and markets sound recordings. Roy Orbison ("Orbison"), a song writer and performer, contracted in 1976 to record exclusively for the debtor in return for specified royalties.

In 1978 by separate document entitled "Mutual Release for Termination of Recording Agreement" ("1978 agreement") the debtor released Orbison from his exclusive recording obligations under the 1976 contract. The preamble of the 1978 Agreement states the parties have agreed to "mutually terminate the [1976] agreement with respect to the further performances by Orbison thereunder and the obligations of Monument to record such performances, and otherwise with respect to the executory provisions of said Agreement."

The 1978 agreement transfers to Orbison certain compositions previously recorded for the debtor and releases Orbison to contract with others to produce and market his recordings. The 1978 agreement reserves to the debtor the production and marketing of other recordings by Orbison that predate the termination agreement and prohibits Orbison from re-recording these other recordings for a period of five years if released by the debtor within 120 days after June 21, 1978. No evidence was presented to indicate that Monument released an Orbison recording within five years prior to March 18, 1983, the date the debtor filed its Chapter 11 petition.

Orbison filed a motion to compel the debtor to assume or reject the 1976/1978 contracts.

## II.

At the request of a party to an executory contract, the bankruptcy court may set a time, prior to confirmation, for assumption or rejection of the contract. 11 U.S.C. § 365(d)(2) (1982 ed., Supp. II 1984); *Data-Link Systems, Inc. v. Whitcomb & Keller Mortgage Co.*, 715 F.2d 375 (7th Cir.1983); *Sealy Uptown v. Kelly Lyn Franchise Co.*, 26 B.R. 441, 446 (Bankr.M.D.Tenn.) *aff'd*, 33 B.R. 112 (M.D.Tenn.1983). The threshold question is whether the contract between the debtor and Orbison is "executory."

The term "executory contract" is not defined by the Bankruptcy Code. The Court of Appeals for this Circuit has provided guidance in two cases decided under the former Bankruptcy Act. *See Sloan v. Hicks (In re Becknell & Crace Coal Co.)*, 761 F.2d 319 (6th Cir.) *cert. denied*, —— U.S. ——, 106 S.Ct. 528, 88 L.Ed.2d 460 (1985); *Chattanooga Memorial Bank v. Still (In re Jolly)*, 574 F.2d 349 (6th Cir.) *cert. denied*, 439 U.S. 929, 99 S.Ct. 316, 58 L.Ed.2d 322 (1978). *See also Waldschmidt v. Metropolitan Lincoln-Mercury, Inc., (In re Preston)*, 53 B.R. 589 (Bankr.M.D. Tenn.1985) *(discussing Sloan and Jolly)* (Code case). The Sixth Circuit has stated: "Executory contracts involve obligations which continue into the future.... Generally, they are agreements which include an obligation for the debtor to do something in the future." *Sloan*, 761 F.2d at 322; *Jolly*, 574 F.2d at 351; *Preston*, 53 B.R. at 591. The legislative history of the 1978 Code contains this observation about "executory contracts": "there is no precise definition of what contracts are executory, it generally includes contracts on which performance remains due to some extent on both sides."[1] H.R.REP. NO. 595, 95th Cong.,

---

[1] This appears to be a restatement of the classic definition of an executory contract as one "under which the obligations of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to com-plete performance would constitute a material breach excusing the performance of the other." Countryman, *Executory Contracts in Bankruptcy: Part I*, 57 MINN.L.REV. 439, 460 (1973). The Countryman definition has not been for-

1st Sess. 347 (1977) *reprinted in* 1978 U.S. CODE CONG. & AD. NEWS 5787, 5963, 6303. *See also NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 522, n. 6, 104 S.Ct. 1188, 1194, n. 6, 79 L.Ed.2d 482, 493 n. 6 (1984) (the debtor's collective bargaining agreement was executory within the meaning of § 365(a) because "both Bildisco and the Union had reciprocal obligations, and at any point during the life of the contract, performance was due by both parties."); *Preston*, 53 B.R. at 591.

The Sixth Circuit arrived at its definition of executory contract through analysis of the purposes of rejection. *Jolly*, 574 F.2d at 351. It determined that a contract is not executory if the objectives of rejection "have already been accomplished, or if they can't be accomplished through rejection." *Id.*[2] Those purposes include: (1) taking advantage of contracts which will benefit the estate; (2) relieving the estate of burdensome contracts;[3] (3) promoting the debtor's fresh start; (4) permitting the allowance and determination of claims; and (5) preventing parties from remaining "in doubt concerning their status vis-a-vis the estate." *See Jolly*, 574 F.2d at 351; *In re Norquist*, 43 B.R. 224, 225, 11 COLLIER BANKR. CAS.2d (MB) 1146 (Bankr.E.D. Wash.1984); H.R.REP. 595, 95th Cong., 1st Sess. 348 (1977) *reprinted in* 1978 U.S. CODE CONG. & AD. NEWS at 6304.

This contract does not contain the continuing mutual obligations necessary to constitute an "executory" contract. After June 21, 1978, Orbison had no obligation to perform or to provide other services to the debtor. The 1978 termination agreement settled the rights of the parties: Orbison received ownership of certain compositions free of any claim of the debtor and the debtor received the rights to use other Orbison recordings subject only to the payment of royalties. In *Jolly*, the Sixth Circuit held that where rights under a contract have been settled by events external to bankruptcy, the goals of rejection are accomplished and the contract is not executory. *Jolly*, 574 F.2d at 351–52.

The only arguably "executory" obligation of Orbison pursuant to the 1978 agreement was Orbison's commitment to refrain from re-recording compositions already recorded for Monument which were or might be released by Monument within 120 days after the 1978 termination agreement. *See Ozark Mahoning Co. v. American Magnesium Co.*, 488 F.2d 147 (5th Cir.1974) ("An executory contract is one in which a party binds himself to do or not do a particular thing."). As the party asserting the existence of an executory contract, Orbison has the burden to demonstrate that this obligation remained executory on the date of bankruptcy. *Preston*, 53 B.R. at 590. Orbison presented no evidence that Monument released an Orbison recording within the period protected by the 1978 agreement. In the absence of such proof, by the terms of the 1978 termination agreement, Orbison had no continuing obligation to perform.[4]

The termination agreement renders the relationship between Orbison and the debtor quite different from the normal licensing, patent or royalty arrangement. A license agreement may be an executory contract if the licensor is obligated to continue to supply the subject matter of the license. Countryman, *Executory Contracts in Bankruptcy: Part II*, 58 MINN.L.REV. 479, 501–02 (1974). However, "where there

---

mally adopted in this circuit. *Preston*, 53 B.R. at 591 n. 5.

**2.** The Sixth Circuit's analysis parallels Countryman, *Executory Contracts Part I, supra* n. 1 at 450.

**3.** I do not decide whether § 365 may be used to avoid a burdensome obligation, such as a contract not-to-complete, where no reciprocal obligation is due from the non-debtor party. *See,*

*e.g., Norquist*, 43 B.R. at 225 (suggesting burdensome obligation is enough).

**4.** In the same vein, Orbison committed to hold the debtor harmless from any breach of the 1976 agreement; however, Orbison has not suggested to this court any continuing performance obligation breach of which might invoke the hold harmless. *See Preston*, 53 B.R. at 591; *Lubrizol*, 756 F.2d at 1046; Countryman, *Executory Contracts Part I, supra* n. 1 at 457–58.

is no express undertaking by the licensor, the agreement with the licensee may not be executory because the licensor may have fully performed merely by executing the license agreement." *Id.* at 502. Here, Orbison essentially sold the debtor the right to use certain recordings. Orbison has no obligation to defend or protect the debtor from any outside infringement or unauthorized use. *See Lubrizol Enterprises, Inc. v. Richmond Metal Finishers, Inc.,* 756 F.2d 1043, 1046 (4th Cir.1985) *cert. denied sub nom, Lubrizol Enterprises, Inc. v. Canfield (In re Richmond Metal Finishers, Inc.),* — U.S. ——, 106 S.Ct. 1285, 89 L.Ed.2d 592 (1986). The debtor has the right to use Orbison's name in connection with the marketing of pre-existing recordings, but Orbison is not required to provide any continuing services or to exercise any continuing restraint. *See Burger King Corp. v. Rovine Corp.,* 6 B.R. 661, 6 BANKR.CT.DEC. (CRR) 1285, 3 COLLIER BANKR.CAS.2d (MB) 114 (Bankr.W.D. Tenn.1980); *In re Petur U.S.A. Instrument Co.,* 35 B.R. 561, 563, 9 COLLIER BANKR.CAS.2d (MB) 1363, 1365–66 (Bankr.W.D.Wash.1983); *Lubrizol,* 756 F.2d at 1046; *Fenix Cattle Co. v. Silver (In re Select-A-Seat Corp.),* 625 F.2d 290 (9th Cir.1980).

The objectives that might be accomplished through assumption or rejection are not furthered by declaring the relationship between Orbison and the debtor to be executory.[5] *Jolly,* 574 F.2d at 351. The amount and allowance of any claim by Orbison can be determined. Any delinquency in payment of royalties to Orbison constitutes a claim in this bankruptcy case and the amount of that claim can be calculated. If continued use of the Orbison recordings by the debtor is not economically advantageous then the debtor can seek to sell its rights in those recordings or otherwise dispose of its interests. If continued use is economically advantageous, then the debt-

or can market and use the recordings acquired pursuant to the 1978 termination agreement subject to the obligation to pay royalties. Orbison is not reasonably in doubt of his obligations vis-a-vis the debtor: he has none that remain to be performed. "Assumption" of this contract would afford the estate no benefit to which it is not already entitled.

An appropriate order will be entered.

---

5. It has been suggested by at least one court that the reciprocal obligations test is merely a threshold and that any contract which meets it must then be measured against Code policies. *In re Gladding Corp.,* 22 B.R. 632, 635 (Bankr.D. Mass.1982). Other courts have suggested that contracts may be executory despite their failure to meet the Countryman definition. *See Norquist,* 43 B.R. at 226.