**In re MONROE WELL SERVICE, INC. (jointly administered with Metro Pipe and Supply Co., Inc., No. 86–02013F; Evergreen Oil & Gas, Inc., No. 86–02014F; Tullos Group, Inc., No. 86–02015F; and SSM (A Pennsylvania Partnership) No. 86–02016F), Debtors.**

**Bankruptcy No. 86–02012F.**

United States Bankruptcy Court, E.D. Pennsylvania.

March 8, 1988.

---

Robert H. Levin, Adelman Lavine Gold & Levin, Philadelphia, Pa., for debtors, Monroe Well, et al.

Michael A. Bloom, Cohen, Shapiro, Polisher, Shiekman & Cohen, Philadelphia, Pa., for Official Committee of Ltd. Partnerships.

C. Warren Trainor, Ehmann & VanDenbergh, Philadelphia, Pa., for Official Creditors' Committee.

W. Malcolm Stevenson, Richard W. Bussoff, Gilbert L. Hamberg, Monroe & Lemann, New Orleans, La. and Gratz, Tate, Spiegel, Erwin & Ruthrauff, Philadelphia, Pa., for Louisiana Power & Light Co.

David W. Folts, Morgan, Lewis & Bockius, Philadelphia, Pa., for Southwestern Elec. Power Co.

## MEMORANDUM OPINION

BRUCE I. FOX, Bankruptcy Judge:

Louisiana Power and Light Company (LP & L) [1] has filed a motion for an order fixing the time for the debtors to assume or reject various executory contracts. The debtors oppose the motion on the basis that the contracts in question are utility agreements which are governed exclusively by the provisions of 11 U.S.C. § 366 and not 11 U.S.C. § 365.[2] After considering the evidence presented and the memoranda submitted, I shall deny the motion without prejudice.

### I.

The facts presented are not really controverted.[3] There are five interrelated debtors in these chapter 11 cases: Monroe Well Services, Inc; Metro Pipe and Supply Co., Inc.; Evergreen Oil and Gas, Inc.; Tullos Group, Inc.; and SSM, (A Pennsylvania Partnership). These five entities filed voluntary petitions in bankruptcy under chapter 11 on April 23, 1986, and these cases were ordered jointly administered. The business purpose of these entities was to find investors willing to enter into limited partnerships in various oil drilling ventures. Once these partnerships were formed, the debtors undertook oil exploration and drilling as well as maintenance and servicing. The debtors' drilling activities took place in four states, including Louisiana. Apparently, 900 wells were drilled in Grant, LaSalle, Winn and Caldwell parishes within Louisiana, of which 750 wells are currently operating. Some or all of these parishes, and 90% of the wells operating, fall within the Tumberland district. LP & L is the exclusive utility company providing for electric power within this district.

Prior to filing for bankruptcy, Monroe Well Service, Inc. and SSM (hereinafter

---

1. Although it did not file a similar motion, Southwestern Electric Power Company believes itself also to be a party to executory utility contracts with the debtors and has filed a memorandum in support of LP & L's motion.

2. The official committee of unsecured creditors also opposes LP & L's motion for the same reasons articulated by the debtors.

3. This memorandum opinion constitutes the findings and conclusions mandated by Bankr. Rules 7052 and 9014.

"debtors") entered into a total of 99 electric service agreements with LP & L. Under the terms of each agreement, LP & L agreed to provide electric service to enable the debtors to drill and operate the wells mentioned above for a period of time—usually three years with a renewal option. In return, the debtors agreed that for the term of the agreement, they would purchase power from LP & L pursuant to a particular rate schedule. Significantly, they also agreed that they would be responsible for a minimum monthly usage charge if their power demands fell below a certain limit.[4] There was no evidence that the debtors are being charged rates lower than those charged to other customers.

All 99 agreements were in effect at the time this petition commenced and are still in effect. The parties agreed that the debtors had a prepetition debt of $170,091.01 to LP & L which remains unpaid. They also agree that the debtors are current in their payments for postpetition services and that LP & L has received in excess of $1 million in postpetition payments.

It is also undisputed that shortly after these bankruptcy cases commenced, LP & L requested "adequate assurance of payment" pursuant to 11 U.S.C. § 366(b). By an order affirmed with modifications by the district court, *In re Monroe Well Services, Inc.*, 69 B.R. 58 (E.D.Pa.1986), the debtors were ordered to pay $24,000.00 per week advance payment to LP & L and were restricted in their ability to increase their electric usage. All parties agree that the debtors have complied with this order.

Finally, testimony was elicited regarding the debtors' ability to obtain alternate power sources to operate these wells. LP & L's district manager acknowledged that movant was the only utility company providing electric service in this state district; other providers are at least 15 miles from these oil fields. If LP & L ceased providing electric service, the district manager stated that the debtors' only option would be to self generate power—that is, pur-

chase their own portable electric power sources—or, convert their machinery from electric motors to some other form of motor (e.g. gasoline). He conceded that neither option was likely to be economically viable given the types of wells and machinery involved. In short, if LP & L does not provide electric service, the debtors' wells will cease operation.

It is against this factual background that I must analyze the motion before me.

## II.

LP & L contends that the 99 electric service agreements are executory contracts within the meaning of § 365. Given the terms of the agreements, I agree that they are executory. Professor Countryman has offered a definition of executory contract that has been accepted by most courts and seems consistent with congressional intent. An executory contract is one

> under which the obligation of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing performance of the other.

Countryman, *Executory Contracts in Bankruptcy, Part I*, 57 Minn.L.R. 439; 460 (1973). *Accord e.g.*, *Lubrizol Enterprises, Inc. v. Richmond Metal Finishers, Inc*, 756 F.2d 1043 (4th Cir.1985). This definition is similar to that articulated in the legislative history surrounding § 365:

> Subsection (a) of this section authorizes the trustee, subject to the court's approval, to assume or reject an executory contract or unexpired lease. Though there is no precise definition of what contracts are executory, it generally includes contracts on which performance remains due to some extent on both sides. A note is not usually an executory contract if the only performance that remains is repayment. Performance on one side of the contract would have been completed and the contract is no longer executory.

---

4. Although it will not affect the outcome of this motion, it appears that this minimum charge was payable only if the debtors continued to operate the wells. Here, the debtors are still operating as debtor in possession.

H.R.Rep. No. 95–595, 95th Cong. 1st Sess., at 347 (1977); S.Rep. No. 95–989, 95th Cong.2d Sess. at 58 (1978), U.S.Code Cong. & Admin.News 1978, p. 5787. *See also N.L.R.B. v. Bildisco & Bildisco,* 465 U.S. 513, 522 n. 6, 104 S.Ct. 1188, 1194 n. 6, 79 L.Ed.2d 482 (1984).

Those courts which have expressed conceptual difficulty in applying § 365 to those contracts in which substantial performance is still due on both sides, *see e.g., In re Oxford Royal Mushroom Products, Inc.,* 45 B.R. 792 (Bankr.E.D.Pa.1985); *In re Norquist,* 43 B.R. 224 (Bankr.E.D.Wash. 1984), have nevertheless defined executory contracts to include those upon which the debtor still has a material obligation of future performance. *See also In re Becknell & Crace Coal Co.,* 761 F.2d 319 (6th Cir.) *cert. denied,* 474 U.S. 1006, 106 S.Ct. 528, 88 L.Ed.2d 460 (1985).

In most instances, an individual homeowner or entity who obtains electric service from the local power company will not have entered into an executory contract. *In re Woodland Corp.,* 48 B.R. 623 (Bankr.D.N. M.1985); *In re M. Miller Ltd.,* 13 B.R. 5 (Bankr.M.D.Pa.1980). There is no obligation in most instances for the homeowner to continue receiving utility service; *see In re Monge Oil Corp.,* 83 B.R. 305 (Bankr.E.D.Pa.1988); *In re Monument Record Corp.,* 61 B.R. 866 (Bankr.M.D. Tenn.1986); the individual is free to cancel service at any time. Here, though, the debtors obligated themselves to purchase a certain minimum amount of service each month from LP & L and LP & L in turn agreed to meet the debtors' power needs. Under these circumstances, the electric service agreements are "executory contracts". *See In re Sharon Steel Corp.,* 79 B.R. 627 (Bankr.W.D.Pa.1987); *In re Wheeling–Pittsburgh Steel Corp.,* 72 B.R. 845 (Bankr.W.D.Pa.1987); *In re California Steel Co.,* 24 B.R. 185 (Bankr.N.D.Ill.1982). *See also In re Electroformex Laboratories, Inc.,* 76 B.R. 894 (Bankr.D.R.I.1987) (utility services provided by lessor; prepeti-

tion utility defaults must be cured upon lease assumption).[5]

A determination that the electric service agreements are executory contracts does not fully resolve this motion. As will be discussed below, LP & L is also a utility provider governed by 11 U.S.C. § 366. In deciding this motion, it is my "duty, under established principles of statutory construction, to give effect, if possible, to every clause and word of the statute." *Bell v. United States,* 754 F.2d 490, 498–99 (3d Cir.1985). *Accord, e.g., Reiter v. Sonotone Corp.,* 442 U.S. 330, 99 S.Ct. 2326, 60 L.Ed. 2d 931 (1979); *Mountain States Telephone & Telegraph Co. v. Pueblo of Santa Ana,* 472 U.S. 237, 105 S.Ct. 2587, 86 L.Ed.2d 168 (1985). This requires that I attempt to interpret section 365 and 366 consistently with one another. In order to fulfill this duty, I must consider both the purposes of these sections and their tensions.

11 U.S.C. § 365 recognizes that executory contracts may represent valuable estate assets. The section sets forth a substantive right to assume an executory contract when the debtor in possession, *see* 11 U.S.C. § 1107, believes such assumption will benefit the estate and enhance the debtor's ability to reorganize, or to reject the agreement when rejection is in the estate's best interest. *See In re Mushroom Transportation Co.,* 78 B.R. 754, 758 (Bankr.E.D.Pa.1987). The standard for reaching this decision is the "business judgment" test. *Group of Institutional Investors v. Chicago, Milwaukee, St. Paul & Pacific Railroad Co.,* 318 U.S. 523, 63 S.Ct. 727, 87 L.Ed. 959 (1943).

■ If the executory contract is rejected, all prepetition defaults constitute an unsecured claim against the estate. *See N.L. R.B. v. Bildisco & Bildisco,* 465 U.S. 513, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984). Furthermore, the rejection of the contract itself constitutes a breach which may give rise to a prepetition claim. 11 U.S.C. § 365(g)(1). Of course, the nondebtor par-

---

**5.** In such circumstances, courts have held a lessor to be a utility provider governed by § 366. *See e.g. In re Coastal Dry Dock & Repair Corp.,* 62 B.R. 879, 883 (Bankr.E.D.N.Y.1986); *In re Good Time Charlie's, Ltd.,* 25 B.R. 226 (Bankr.E. D.Pa.1982).

ty has no duty to perform in accordance with a contract that has been rejected. *See In re Auto Dealer Services, Inc.* 65 B.R. 681, 684 (Bankr.M.D.Fla.1986). *In re Silver,* 26 B.R. 526, 530 (Bankr.E.D.Pa.1983).

 Generally, if the executory contract is assumed, the estate is liable for the full performance of the contract and any subsequent postpetition breach or rejection creates an administrative expense claim. *N.L.R.B. v. Bildisco & Bildisco.* Moreover, any duty to cure a prepetition default becomes a first priorty administrative obligation of the estate. *LJC Corp. v. Boyle,* 768 F.2d 1489, 1494 n. 6 (D.C.Cir.1985); *In re Mushroom Transportation Co.*

Here, LP & L is quite explicit in its position. If the debtors assume the 99 electric service agreements, it expects it to be paid its prepetition obligation promptly, and it expects the debtors to be responsible for the minimum monthly payment charges over the life of the agreements. If the agreements are rejected, LP & L plans to discontinue electric service. (Motion ¶ XIX–XX).

The debtors argue that they have no choice but to assume the contracts if rejection would result in the termination of electric power, as otherwise they would have to cease operations. (Of course assumption would require the debtors to pay LP & L its prepetition claim.) They contend that § 366 was designed to prevent a utility company from having such leverage. To a large extent the debtors are correct.

 Section 366 had no ancestor in the former Bankruptcy Act of 1898. By its provisions, § 366(a) prevents a utility company from discontinuing utility service to a debtor solely on the basis of the debtor's failure to pay a prepetition debt. In return for its duty to continue utility service, a utility company is entitled to receive adequate asssurance of future payment within twenty days of the commencement of the case. § 366(b). *See generally In re Kiriluk,* 76 B.R. 979 (Bankr.E.D.Pa.1987). However, unlike § 365, § 366 does not require the debtor to pay a prepetition debt in

order to obtain continued electric service. *Id.* at 982.

The purpose of § 366 is stated in its brief legislative history:

This section gives debtors protection from a cut-off of service by a utility because of the filing of a bankruptcy case. This section is intended to cover utilities that have some special position with respect to the debtor, such as an electric company, gas supplier, or telephone company that is a monopoly in the area so that the debtor cannot easily obtain comparable service from another utility. The utility may not alter, refuse, or discontinue service because of the nonpayment of a bill that would be discharged in the bankruptcy case. Subsection (b) protects the utility company by requiring the trustee or the debtor to provide, within ten days, adequate assurance of payment for service provided after the date of the petition.

S.Rep. No. 95–989, 95th Cong.2d Sess. at 60 (1978), U.S.Code Cong. & Admin.News 1978 at 5846.[6]

The utility company's obligation, under § 366(a), to continue, uninterrupted, utility services postpetition represents a conscious desire to overrule pre-Bankruptcy Code decisions to the contrary. *Bankruptcy Act Revision: Hearings before the Subcommittee on Civil and Constitutional Rights, Committee on the Judiciary, House of Representatives,* 94th Cong. 1st & 2d Sess. H.R. 31 and H.R. 32. Appendix Serial No. 27, at 233 (1975): ("New. This section overrules case law allowing a utility to condition future service on payment of a prepetition debt.") *Accord* 2 *Collier on Bankruptcy,* ¶ 366.01 at 366–1 (15th ed. 1987):

Under the Act a substantial split had developed in the circuit courts over whether a utility might be prevented from using the threat of service discontinuance as a collection device.

Based upon the facts as presented here, LP & L is a monopoly electric power servicing the debtor's oil wells. The debtor can-

**6.** The ten day provision was ultimately increased to twenty days. 11 U.S.C. § 366(b).

not easily obtain comparable service from another source; in fact, it probably cannot obtain any other power supply at all. Therefore, LP & L is governed by the restrictions found in § 366(a), *see In re Gehrke*, 57 B.R. 97 (Bankr.D.Ore.1985); and, it has already availed itself of the benefits offered under § 366(b) by having the debtor pay for all postpetition electric usage in advance.

Since § 366(a) prevents a utility company from discontinuing service due to the existence of a prepetition debt, and the rejection of an executory contract creates a prepetition obligation, to allow a utility company to discontinue service upon rejection would be to ignore the express purpose of § 366. Indeed, LP & L's interpretation of sections 365 and 366 whereby the utility company receives adequate assurance of future payments within twenty days, even though the debtor has not decided whether to assume or reject the executory contract, grants to utility companies a position preferred over all other creditors who are parties to executory contracts. This preference would occur because adequate assurance under § 365 need not be offered until a decision is made to assume the contract. Additionally, LP & L implicitly contends that utilities which are parties to executory contracts can discontinue services after twenty days even though no decision to reject the contract has been made. Again, that interpretation would distort § 366, which was intended to limit the leverage held by utility companies, not increase it.

Similarly though, I cannot accept the debtors' argument that executory contracts are not affected by § 365 if one party to the contract is a utility company. The utility contract may charge a debtor below market rates in return for a guaranteed minimum purchase requirement over a period of time. There is nothing in § 366 which permits the debtor to retain the benefits of an executory utility contract without fulfilling its obligation. *In re Sharon Steel Corp; In re California Steel Co.*

Therefore, in order to effectuate the provisions of both sections 365 and 366, I conclude that a utility company must pro-vide service, (assuming that the debtor has complied with § 366(b)), even if a debtor rejects an executory utility agreement. *In re Sharon Steel Corp. But see In re Kentech Corp.*, 36 B.R. 552 (Bankr.W.D.Ky.1983). However, the provision of service may be on terms applicable to new customers similarly situated with the debtor. *In re Sharon Steel Corp; In re Thatcher Glass Corp.*, 59 B.R. 797 (Bankr.D.Conn.1986). *See In re Roberts*, 29 B.R. 808 (E.D.Pa.1983); *In re Kiriluk.* The rejection of the contract may create an unsecured prepetition claim; and the provisions of § 503(b) would apply, if appropriate.

▋ The debtor's assumption of the executory contract, on the other hand, would allow the enforcement of contracted terms, such as below market rates, but only if the requirements of § 365(b) were met. Under § 365, the assumption must be of the entire contract. *See In re Nitec Paper Corp.*, 43 B.R. 492 (S.D.N.Y.1984). Any failure of the debtor to comply with § 365(b) after assumption would result in the creation of an administrative expense claim. *In re Mushroom Transportation Co.* Moreover, the failure of the debtor to pay for postpetition service, (whether the contract has been assumed or rejected), may allow the utility company to exercise nonbankruptcy created remedies. *See Begley v. Philadelphia Elec. Co.*, 760 F.2d 46 (3d Cir.1985).

### III.

In sum, I conclude that the 99 electric service agreements are executory contracts governed both by § 365 and § 366. Pursuant to § 365(d)(2):

> In a case under chapter 9, 11, 12, or 13 of this title, the trustee may assume or reject an executory contract or unexpired lease of residential real property or of personal property of the debtor at any time before the confirmation of a plan but the court, on the request of any party to such contract or lease may order the trustee to determine within a specified period of time whether to assume or reject such contract or lease.

■ LP & L is requesting by this motion that I order the debtors to reach an immediate decision whether to assume or reject their utility agreements. I note that whether to shorten the time period, (and by how much), is a matter left to the broad discretion of the bankruptcy court. *Matter of Whitcomb & Keller Mortgage Co., Inc.,* 715 F.2d 375, 379 (7th Cir.1983); *In re New York Deli, Ltd.,* 41 B.R. 198 (Bankr.D.Ha. 1984). As the district court in *Matter of Dunes Casino Hotel,* 63 B.R. 939, 949 (D.N.J.1986) explained, the exercise of this discretion should be undertaken after considering a variety of factors:

> In determining what constitutes a reasonable time within which a debtor should assume or reject a contract, the court should consider a number of factors, including: "The nature of the interests at stake, the balance of the hurt to the litigants, the good to be achieved, the safeguards afforded those litigants, and whether the action to be taken is so in derogation of Congress' scheme that the court may be said to be arbitrary." *In re GHR Energy Corp.,* 41 B.R. 668, 676 (Bankr.D.Mass.1984), *quoting In re Midtown Skating Corp.,* 3 B.R. 194, 198 (Bankr.S.D.N.Y.1980). Above all, the court should interpret reasonable time consistent with the broad purpose of Chapter 11, which is "to permit successful rehabilitation of debtors." *NLRB v. Bildisco & Bildisco,* 465 U.S. 513, 104 S.Ct. 1188, 1194, 79 L.Ed.2d 482 (1984)

■ On the evidence presented in the matter at bench, it is difficult to see what purpose would be achieved by requiring the debtors to exercise their option under § 365 prior to confirmation. The debtors have provided adequate assurance of future payments and are current in their postpetition utility bills. *See In re New York Deli Ltd.* Confirmation is scheduled for April 27, 1988 and the debtors' plan provides that unless previously assumed, the utility agreements will be rejected. (Fourth Amended Plan, at 19). Therefore a decision will be rendered shortly on the matter. Furthermore, to require the debtors to assume or reject prior to confirmation will require that there be a hearing with notice to all parties in interest. Bankr.Rule 6006(a). *See In re Kelly Lyn Franchise Co., Inc.,* 26 B.R. 441 (Bankr.M.D.Tenn. 1983). There are more than one thousand creditors of these debtors who may be affected if the debtors' were to decide to assume the contracts and potentially create an administrative expense claim. *See In re Mushroom Transportation Co.* Thus, to grant LP & L's request for a hearing will add a significant cost to the estate.

Finally, and equally importantly, the movant has not articulated any need for a more prompt decision. Its only witness was unable to testify as to the purpose of the motion. And, its desire to terminate service if the contracts are rejected is obviated by § 366(a). If the record had disclosed that the debtors were paying below market rates for electric service, I might conclude that some purpose would be served by an earlier election under § 365. In that instance, assumption versus rejection is meaningful. But in the matter at bench no such evidence was offered. Thus, the debtors are virtually certain to reject the contract if the postpetition rate is equivalent to the contract rates, and the sole effect of requiring a separate hearing would be to cause additional expense to the estate. *See In re N–Ren Corp.,* 69 B.R. 85, 87 (Bankr.S.D.Ohio 1987) (no valid reason to set an earlier date under § 365(d)(2)).

For these reasons I decline to require the debtors to assume or reject prior to confirmation. *See Matter of Whitcomb & Keller Mortgage Co., Inc.* However, I will deny LP & L's motion without prejudice. If the rates have changed so that the debtors are obtaining below market electric service under their contracts, LP & L may choose to raise this matter again. In addition, if confirmation does not occur on April 27, 1988, the movant may wish to renew its motion.

An appropriate order will be entered.