**In the Matter of James TAYLOR, Debtor.**

**No. 88–03507.**

United States Bankruptcy Court, D. New Jersey.

Sept. 14, 1988.

---

Okin, Cohen & Hollander by Paul S. Hollander, Fort Lee, N.J., for debtor.

Stark and Stark by Richard N. Shaine, Princeton, N.J., for PolyGram Records, Inc. and PolyGram Songs, Inc.

Weltman & Moskowitz by Richard E. Weltman, New York City, for Delightful Music Ltd.

## OPINION

WILLIAM F. TUOHEY, Bankruptcy Judge.

This matter comes before the Court based upon four motions. The initial mo-

tion was filed by the debtor and seeks to reject certain executory contracts and agreements between the debtor and Poly-Gram Records, Inc. and other entertainment-related corporations. In addition, the debtor has moved to reject an executory contract and management agreement between the debtor and World–Wide Entertainment Complex, Inc. For their part PolyGram Records, Inc. and PolyGram Songs, Inc. have cross-moved seeking to dismiss the debtor's Chapter 11 petition or, in the alternative, to have this Court abstain from hearing motions for the rejection of executory contracts. Delightful Music Ltd., one of the contracting parties whose agreement the debtor seeks to reject, cross-moves along with PolyGram for a dismissal of the Chapter 11 petition, or in the alternative, abstention.

The parties have submitted over 154 exhibits comprising several thousand pages. In addition, the Court has listened to extensive oral argument of counsel over a two-day period.

### FINDINGS OF FACT

Based upon the record submitted by the parties, the Court makes the following findings of fact.

1. On May 24, 1988, James Taylor filed a voluntary Chapter 11 bankruptcy petition before this Court.

2. The debtor is a well-known recording artist who is a professional singer, composer and entertainer. From 1979 through February, 1988, Mr. Taylor had been engaged as the lead singer and a principal member of the rock music group professionally known as "Kool And The Gang."

3. In his bankruptcy petition Mr. Taylor asserts debts totalling $4,518,701.50 and assets scheduled at $734,215.00.

4. The parties are all in agreement that Mr. Taylor joined the Kool And The Gang singing group in 1979. It is further undisputed that at that time the singing group was contractually obligated to furnish its recording services to De–Lite Recorded Sound Corp. ("De–Lite"). The individual singers in the group had formed a corporation that was known as Quintet Associates, Inc. ("Quintet"). It was the Quintet corporation that entered into a record contract with De–Lite. De–Lite was and is an independent manufacturer and distributor of phonograph records.

5. Kool And The Gang operated through what were called "furnishing companies." These corporations were the actual contracting entities for the services of the artistic performers. "Kool And The Gang" was a name only; all contracts and legal relationships were arranged through one of the three basic furnishing companies. Quintet referred to above was the vehicle primarily used for Kool And The Gang's recorded performances.

6. A second furnishing company known as Fresh Start Music, Inc. ("Fresh Start") was a corporation formed by the group as the vehicle through which song publishing was conducted. Another corporation variously called Road Gang Enterprises, Inc. and/or Road Gang Associates Ltd. ("Road Gang") was formed to furnish the group's services in connection with concerts and tours.

7. During the years when Mr. Taylor was a member of the group the business and financial affairs of Quintet, Fresh Start and Road Gang, as well as the individual business affairs of Mr. Taylor and other members of the singing group, were managed by T.W.M. Management Services Ltd. ("TWM"). TWM was responsible for receiving all of the income of the Kool And The Gang entities and managing and controlling the disbursement of said funds. TWM paid the business as well as the personal living expenses of the individual members of the singing group. It was the responsibility of TWM to maintain all of the books and other business records that pertain to the financial affairs of Kool And The Gang and the various entities described above.

8. In January, 1984, the individual members of the group entered into a management agreement with World–Wide Entertainment Complex, Inc. ("World–Wide"). This corporation was an affiliate of TWM and pursuant to the January, 1984 agree-

ment, World–Wide was engaged to manage the careers of the individual members of the group as professional entertainers. Thus, for the past four years all of the business and personal management of Kool And The Gang entities, as well as those of the debtor, were under the joint control of TWM and World–Wide.

9. The performing talent in the Kool And The Gang group met with management periodically to review the group's finances. Group members borrowed from the various corporations owned by the group for their living expenses. In the period July 1, 1983 to July 31, 1985, excluding salaries, the members of the singing group had internal loans of $2,138,947.00 which they owed back to the business entities. (Exhibit # 5).[1] The only member of the group as of July 18, 1986 not indebted to the group for these internal advances was the debtor herein, James Taylor.

10. In November of 1985, De–Lite assigned its rights under the Quintet recording agreement to PolyGram Records, Inc. ("PolyGram"). The De–Lite contract was thereupon terminated and a new agreement for the exclusive recording services of Kool was executed between PolyGram and Quintet.

11. At the time of the new PolyGram recording contract Quintet executed a music-publishing agreement with De–Lite's affiliate, Delightful Music Ltd.

12. In the management report for October 22, 1986, the members of the Kool And The Gang group were advised that the fixed costs of the group were up to $339,-000.00 per month. The group on said date was advised by its manager: "Because of our increased fixed expenses we need to net from all income approximately $4,000,-000 per year." (Exhibit # 5).

13. In the management meeting held on December 3, 1987, the group was told their recent road trip was not successful. "Album sales hurt us, we have serious problems. Must cut all expenses. This has been stated many times...." (Exhibit # 5).

14. The cash flow problems of the Kool And The Gang group had started in 1986. In October, 1986, the Kool And The Gang entities had accumulated debts in excess of $1,719,000, exclusive of any borrowings from PolyGram. (October 22, 1986 Management Report, Exhibit # 5).

15. During the course of 1986, the Kool And The Gang subsidiary Quintet borrowed a total of $665,000 from PolyGram. (Exhibit # 80).

16. With their financial problems continuing into 1987, the musical group entered into a loan and security agreement with PolyGram by which, pursuant to a check dated March 3, 1987, PolyGram advanced an additional $500,000 to Quintet. (Exhibit # 148).

17. It is interesting to note that after receipt of the March, 1987, $500,000 check, the group's financial condition was still in such desperate straits that on April 20, 1987, Gerald Delet, manager of the group wrote to PolyGram:

> At the present time there are some serious financial and emotional problems....
> On the financial side, we desperately need some assistance.
>
> . . . . .
>
> We have just started our tour, and by around the middle of May we should be self-sufficient until the tour ends, which will be at the end of this year. To go on tour we had to write a lot of post-dated checks for the pre-tour costs plus our fixed overhead which we cannot cover at this time.... We also have not paid certain pretour costs which are due right now—and just as an example, the lighting people and the sound people could very easily have pulled their equipment off the tour.
> We need approximately $500,000....

(Exhibit # 146).

18. When Delet's letter of April 20, 1987 pressing for an additional $500,000 advance did not achieve results, a second, April 29, 1987, letter was hand delivered by

---

**1.** References are to appendix exhibits. Numbers 1 through 109 are in the Polygram appendix; numbers 111 through 162 are in debtor's appendix.

Delet to PolyGram Records. Said letter contains the following language:

I, and Kool and the Gang, are under extreme pressure. . . .

In asking for the half million dollars as per my letter to Dick, and saying that we would not come back to you for the remainder of the year, which I have never said to anybody before, is extremely important and factual. . . . Once the tour is in full swing, we will be able to meet our monthly bills, but until that point I really have checks that will be returned and open bills that must be paid or there will be suits against us. I really understand your position but without sounding dramatic, this is probably the most important advance for us.

(Exhibit # 147).

19. At the management meeting held on December 3, 1987, the group was presented with a list of its outstanding bills as of November 30, 1987. This list reflects outstanding loans and accounts payable owed by the group of $3,352,109. The report is careful to note that said sum does not include PolyGram advances which at that time were approximately $950,000. The PolyGram advances were to be repaid from royalties which included artistic royalties, publishing royalties and BMI royalties involved with the radio and television playing of the group's music. (Exhibit # 5).

20. Because the management group was not able to pay the personal living expenses of the group members, Mr. Delet, in a letter of January 15, 1988 to PolyGram (exhibit # 128), notes that the group had an immediate cash requirement and need of $121,407.00. This sum included $26,690.06 necessary to stop a mortgage foreclosure about to be filed against a group member's residence, and in addition to make mortgage arrears payments on the personal homes of other group members.

21. Of said debts owed by the various Kool And The Gang entities, certain debts had been personally guaranteed by Mr. Taylor, the debtor herein. Particularly, a loan from First Intercounty Bank (now under the jurisdiction of the FDIC) in the amount of $515,000; a second bank loan from First City National Bank in the amount of $265,000 and an advance from Norby Walters in the sum of $514,000. It is asserted by PolyGram that the debtor due to modifications in the aforesaid original loan agreements was not liable for any of these personal obligations at the time the Chapter 11 petition was filed.

22. The debtor last performed as an artist with Kool And The Gang on tour in Africa in February of 1988. On February 16, 1988, the debtor wrote to Mr. Delet, his manager, and revoked a general power of attorney held by the manager. (Exhibit # 74).

23. The debtor opened discussions with PolyGram on his future as a solo performer in early February of 1988. (Exhibit # 102). On February 8, 1988, PolyGram wrote to Quintet and advised Quintet that PolyGram was exercising its rights to continue as the recording company for Mr. Taylor pursuant to the "leaving member" provision of the Quintet recording contract. (Exhibit # 104).

## CONCLUSIONS OF LAW

The main thrust of the argument advanced by PolyGram and Delightful is that the Court should dismiss the debtor's Chapter 11 petition based upon the fact that the petition was filed in bad faith because Mr. Taylor did not have substantial debts at the time of the filing of the petition. PolyGram concedes that the First Intercounty Bank of New York obligation was a loan for which the debtor was originally personally liable as a co-signer and as guarantor. The bank had loaned money to the Kool And The Gang group and had requested that the individual members co-sign the bank note. PolyGram asserts, however, that an agreement was executed in April of 1988 (Exhibit # 71) which provided for repayment of the First Intercounty Bank debt by the Kool And The Gang group in part with advances from PolyGram. The April, 1988 agreement with First Intercounty Bank (now under the jurisdiction of the FDIC) was not signed by the debtor, James Taylor.

The second obligation attacked by Poly-Gram arises out of a $250,000 promissory note in connection with a loan undertaken by the Kool And The Gang group from First City National Bank & Trust Co. When said loan was in default a stipulation of settlement with First National City Bank was entered into by the debtor's former manager. (Exhibit # 73). PolyGram asserts that the First City National Bank stipulation of settlement entered into in March of 1988 extended the time for payment of said bank's obligation, and thus relieved the debtor, James Taylor, from any obligations on the original note endorsement.

The third debt under attack is a Norby Walters debt.[2] PolyGram in its brief concedes that the Norby Walters debt involved numerous notes on which the individual group members were personally liable. However, PolyGram asserts, the open balance due was combined into a new note executed February 15, 1988, in the sum of $425,000. (Exhibit # 54). It is asserted by the record company that inasmuch as said promissory note is not signed by the debtor herein that debtor's liability under the previous notes has been terminated.

Turning to the First Intercounty Bank debt, it is conceded that the total amount of said debt owed by the various Kool And The Gang entities totalled $515,000. (Exhibit # 72). PolyGram has placed in evidence the deposition testimony of Gerald Delet, business manager for the group. Mr. Delet has testified at his deposition (July 26, 1988, page 334, commencing line 23 and continuing) that the group's business dealings with First Intercounty involved several notes and loan guarantees. There was a Road Gang Associates note in the sum of $320,000. (Exhibit # 158). Said note was personally signed by the debtor, Mr. Taylor. In addition, the individual group members entered into a personal guarantee of the Road Gang note. (Exhibit # 158). Mr. Delet further testified that there was a separate loan to Quintet Asso-ciates with the First Intercounty Bank. He further testified that there was a separate loan guarantee with respect to the Quintet note. The Quintet note has not been placed in evidence before the Court; however, an unlimited loan guarantee of the Quintet obligation signed by the debtor has been placed before the Court as Exhibit "B" attached to the Taylor brief filed with the Court August 12, 1988.

Both the Road Gang and Quintet personal guarantees signed by the debtor in favor of the First Intercounty Bank contain the following language:

The Bank may at any time and from time to time (whether or not after revocation or termination of this guaranty) without the consent of, or notice to, the undersigned, without incurring responsibility to the undersigned, without impairing or releasing the obligations of the undersigned hereunder, upon or without any terms or conditions and in whole or in part:

(1) change the manner, place or terms of payment and/or change or extend the time of payment....

As to each of the undersigned, this guaranty shall continue until written notice of revocation signed by such undersigned, or until written notice of the death of such undersigned shall in each case have been actually received by the Bank.... Written notice as above provided shall be the only means of revocation or termination of this guaranty notwithstanding the fact that for periods of time there may be no outstanding liabilities of the Borrower. No revocation or termination hereof shall effect in any manner the effectiveness and applicability of this guaranty or any rights of the Bank or the obligations of the undersigned hereunder, with respect to (a) liabilities of the Borrower which shall have been created, contracted, assumed or incurred prior to receipt by the bank of written notice of such revocation or termination, (b) all

---

2. Norby Walters was the group's booking agent. The Kool And The Gang management periodically borrowed sums from Norby Walters. As of April 15, 1987, Norby Walters was owed the sum of $500,000 by the group. Said obligation was personally guaranteed by the debtor.

extensions, renewals or modifications of any of the liabilities referred to in (a) above made after receipt by the Bank of such written notice. . . .

Therefore, under the terms of the First Intercounty Bank guarantees, the bank is expressly given the right to modify, renew or alter in any way the terms of the underlying indebtedness. The parties have agreed in their documentation that the relationship between Mr. Taylor and the First Intercounty Bank will be governed by the laws of the State of New York. Under New York law provisions such as are contained in the guarantees of the Quintet and Road Gang obligations owing to First Intercounty Bank are enforceable. *National Bank of North America vs. Sobel*, 31 A.D. 2d 750, 297 N.Y.S.2d 476, 478 (1969).

The *Restatement of Security*, § 129(1) (1941), states in subsection (b):

**Time of Consent by Surety.** The surety's consent to an extension of time of payment may be either before or after the extension is made. The surety is bound by his consent, whether it becomes part of his contract or amounts to a waiver of a defense.

The Court finds that often guarantees to financial institutions contain language similar to that before this Court which provides that the guarantor has given prior consent to modifications in the underlying agreement. The following cases have upheld said waiver of future modifications of the underlying agreement and have held the surety still to be liable on the primary debt: *Woods–Tucker Leasing Corp. of Georgia vs. Kellum*, 641 F.2d 210, 217 (5th Cir.1979); *Black vs. O'Haver*, 567 F.2d 361, 369 (10th Cir.1977), *cert. den.* 435 U.S. 969, 98 S.Ct. 1609, 56 L.Ed.2d 61 (1978); *Nikimiha Securities Ltd. vs. Trend Group Ltd.*, 646 F.Supp. 1211, 1218 (E.D.Pa.1986).

This Court thus finds for the purposes of deciding the issue as to whether this bankruptcy petition was filed in bad faith that the First Intercounty (FDIC) obligation of $515,000 was a contingent liability of such magnitude such as to justify the filing of the within Chapter 11 petition and qualifies as a legitimate debt owing by the debtor herein.

 It is undisputed that the notes in evidence before the Court reflect that the debtor, James Taylor, signed a series of promissory notes promising to personally repay Norby Walters for advances made to the Kool And The Gang group. The Norby Walters agreement of June 18, 1987 (Exhibit # 52) makes reference to outstanding promissory notes amounting to $300,000 plus an additional advance tendered on that date of $400,000, for a total indebtedness of $700,000. (The promissory notes signed by Mr. Taylor to Norby Walters are reflected as Exhibits # 53, # 60, # 61, # 62, # 63, # 64.)

Mr. Delet, the manager of the group, testified that on February 15, 1988, the members of the group, excluding Mr. Taylor, executed a new promissory note to Norby Walters in the sum of $425,000. (Exhibit # 54). The record is not clear as to whether Norby Walters has waived any of his rights on the aforesaid promissory notes executed by debtor, James Taylor, and whether by accepting the promissory note of February 15, 1988, in the sum of $425,000 as a matter of law Norby has, in fact, waived his rights against Taylor. However, the continuous existence of the promissory notes signed by Taylor which are before the Court certainly are sufficient to get by the motion of PolyGram and Delightful to dismiss the within proceeding as a bad faith filing.

Generally the mere execution of a renewal note does not discharge the original obligation. *In re Cooley*, 624 F.2d 55, 57 (6th Cir.1980); *In re Thayer*, 38 B.R. 412, 419 (Bankr.D.Vt.1984); *In re Tabers*, 28 B.R. 679, 684 (Bankr.W.D.Ky.1983); *In re Hopper*, 17 B.R. 292, 294–95 (Bankr.W.D.Ky. 1982); *In re Harris*, 17 B.R. 210, 211 (Bankr.W.D.Ky.1982); *In re Gibson*, 16 B.R. 257, 262–64 (Bankr.D.Kan.1981); *In re Holland*, 16 B.R. 83, 87–88 (Bankr.N.D. Ohio 1981); *United Counties Trust Co. v. Podvey*, 160 N.J.Super. 244, 253, 389 A.2d 515 (Law Div.1979). Whether a renewal note extinguishes the obligation under the prior note is determined by an examination

of the intent of the parties—a question of fact. *See generally,* Annotation, *Renewal Note Signed By One Comaker As Discharge of Nonsigning Comakers,* 43 A.L. R.3d 246 (1972 and Supp.1987); *see also, Mount Holly State Bank v. Mount Holly Washington Hotel,* 220 N.J.Super 506, 510–11, 532 A.2d 1125 (App.Div.1987).

The debtor's tangled web of finances as reflected by the First Intercounty notes of $515,000.00, the First City National Bank note of $250,000.00 and the series of Norby Walter notes of $500,000.00, all of which promissory notes and guarantees signed by the debtor total $1,065,000.00, excluding the Polygram debt, qualify Mr. Taylor as a debtor seeking relief under the Code.

## THE NATURE OF THE POLYGRAM RECORDING CONTRACT AND ITS IMPACT UPON THE DEBTOR

On November 13, 1985, PolyGram Records, Inc. entered into a recording contract with Quintet. (Exhibit # 85). By the terms of this contract PolyGram agreed to record and Quintet agreed to perform artistic services in connection with the creation of certain sound recordings. Under the various options contained in the contract Quintet had committed to produce eight albums for PolyGram.

Under paragraph 6 of said recording contract PolyGram agreed to pay certain advances to Quintet. (Exhibit # 85). However, said advances were recoupable from royalties accruing to Quintet's account.[3] Paragraph 15 of the recording contract commencing on page 39 deals with an artist who leaves the singing group. Under said clause PolyGram has the right to require the leaving artist to perform a minimum of four albums as a solo artist for PolyGram. While the debtor herein did not sign the prime recording contract, said agreement having been signed by Quintet Associates, the debtor nonetheless on November 13, 1985, the same date on which the recording contract was signed, did execute what is referred to in the parlance of the record

industry as an "inducement letter." Said inducement letter is contained as part of Exhibit # 85. By the terms of the inducement letter, Mr. Taylor, individually and personally, adopted the language of the leaving member clause contained in the primary recording contract between Quintet and PolyGram and thus obligated himself as a solo performer to record for PolyGram upon leaving the Kool And The Gang group.

By letter dated February 18, 1988, PolyGram records wrote to Quintet Associates and advised Quintet that PolyGram was pursuing its rights under the leaving member clause of the recording contract to continue the services of James Taylor as a recording artist for the PolyGram label. (Exhibit # 104).

It is undisputed that prior to the filing of the within Chapter 11 petition, there were negotiations between Mr. Taylor and PolyGram concerning his future artistic performances. A PolyGram confidential memo placed before the Court by PolyGram as Exhibit # 105 in its appendix reflects that two courses of action were being discussed in March of 1988. Under one course of action PolyGram would receive a lump-sum buy-out of approximately $5,000,000 from Mr. Taylor to be released from his contract. The second alternative would be to negotiate a new recording contract between Mr. Taylor and PolyGram.

Under paragraph 15.04 of the PolyGram/Quintet recording contract, leaving members are penalized in that PolyGram shall be entitled to combine such leaving member's personal recording account as a solo performer with the royalty account created by the Kool And The Gang group through Quintet under the prime recording contract. What this means to Mr. Taylor is that the advances made to Kool And The Gang through Quintet, which as of November 30, 1987 amounted to $950,000, can be recouped by PolyGram by offsetting any unreimbursed Kool And The Gang ad-

---

**3.** Exhibit # 80 reflects all advances to Quintet (Kool) by PolyGram from November 13, 1985 to November 5, 1987. Said advances total $3,038,-171.66. During this period one album was re-

leased for PolyGram, and at the time of the hearings, a second album involving the group's past "greatest hits" was in preparation.

vances against James Taylor royalties generated as a solo performer.

## DEBTOR HAS THE RIGHT TO FILE A CHAPTER 7 BANKRUPTCY PETITION, AND PURSUANT TO SAID CHAPTER 7 PETITION VOID ALL FUTURE OBLIGATIONS UNDER HIS RECORDING CONTRACTS

The case of *Matter of Noonan,* 17 B.R. 793 (Bankr.S.D.N.Y.1982) involved a dispute between a recording artist and Arista Records which is remarkably parallel in some respects to the case before this Court. While the debtor in *Noonan* had performed as a solo performer, he was contracted to Arista on a multi-album arrangement. Bankruptcy Judge Roy Babitt noted that prior to bankruptcy the albums recorded by the debtor Noonan, while having received critical acclaim, had generated modest income. This meant the royalties due to Noonan fell far below the amounts which had been advanced by the record company and from which the record company was entitled to recoup its out-of-pocket outlay.

The Court in *Noonan, supra,* went on to note that Arista wished to hold Noonan to his future recording contract so that it could recoup its past losses from his future recordings.

Noonan, however, sees things otherwise for he now finds himself in a position where the sales for a third album would have to exceed one million units to reach the $500,000 recoupment Arista would be entitled to after advancing production costs for this new album.

*Noonan, supra,* at 795.

The debtor herein finds himself in a similar dilemma to that facing Mr. Noonan. The ability of Kool And The Gang to succeed in the future and to generate sufficient future income to repay PolyGram for the advances approaching $1,000,000 which are owed to the record company is somewhat speculative and in doubt.

In *Noonan, supra,* the debtor had initially filed a Chapter 11 petition and had petitioned the Court to reject the Arista recording contract. Thus, said case would have been four square with the matter before

this Court. However, Arista vehemently opposed Noonan's motion to reject the executory record contract. The opinion notes that Noonan exercised his absolute right to convert his Chapter 11 case to a Chapter 7 case. Pursuant to Chapter 7 of the Bankruptcy Code there is an automatic rejection of executory contracts pursuant to 11 U.S. C. Section 365(d)(1). The issue before Judge Babitt in *Noonan* was whether Arista as the record company could reconvert the case to a Chapter 11 proceeding and force an assumption of the recording contract as part of a Chapter 11 plan put forth by the record company. Judge Babitt refused to reconvert the case to Chapter 11. Thus, the debtor remained in Chapter 7 and the Arista contract was rejected.

### THE RECORD CONTRACT IS EXECUTORY

█ The term "executory contract" is not defined by the Bankruptcy Code. The Sixth Circuit has noted, "Executory contracts involve obligations which continue into the future ... generally, they are agreements which include an obligation for the debtor to do something in the future." *Sloan vs. Hicks,* 761 F.2d 319, 322 (6th Cir.1984), *cert. den.,* 474 U.S. 1006, 106 S.Ct. 528, 88 L.Ed.2d 460 (1985).

The legislative history of the 1978 Code contains this observation about executory contracts, "There is no precise definition of what contracts are executory, it generally includes contracts on which performance remains due to some extent on both sides." H.R.Rep. No. 595, 95th Congress, 1st Sess. 347 (1977); *reprinted in* 1978 U.S. Code Cong. & Admin. News 5787, 6303; *see also, N.L.R.B. vs. Bildisco,* 465 U.S. 513, 522, 104 S.Ct. 1188, 1194, 79 L.Ed.2d 482 (1984).

Thus, the Court finds that the November 13, 1985, recording contract between Poly-Gram and Quintet, which is personally and directly enforceable against the debtor herein pursuant to the inducement letter signed by the debtor also on November 13, 1985, is an executory contract in that it provides and obligates the debtor herein to perform recording services for PolyGram into the future and obligates PolyGram to

make certain cash advances in connection with the production of said records and to further market said records.

The Court notes the case of *In re Monument Record Corp.*, 61 B.R. 866 (Bankr.M. D.Tenn.1986), involved the recording contract of a performer known as Roy Orbison. Mr. Orbison was not in bankruptcy, but his former recording company, Monument Records, was the debtor. Mr. Orbison petitioned the bankruptcy court for an order declaring that a 1976 record contract was an executory contract and Mr. Orbison sought to have the bankruptcy court compel Monument to assume or reject said contract. In analyzing the factual pattern, the bankruptcy court had occasion to note that in 1978 Mr. Orbison and his record contracting company had entered into a separate document entitled "Mutual Release for Termination of Recording Agreement."

The bankruptcy court in *Monument, supra,* went on to conclude that as a result of the mutual release and agreement of 1978 all future rights of the parties had terminated and that, therefore, the agreement was non-executory. In the course of reaching this conclusion Bankruptcy Judge Lundin, in the *Monument Record* case had occasion to note at page 868:

> The Sixth Circuit arrived at its definition of executory contract through analysis of the purposes of rejection. [Citation omitted]. It determined that a contract is not executory if the objectives of rejection "have already been accomplished, or if they can't be accomplished through rejection." *Id.* Those purposes include: (1) taking advantage of contracts which will benefit the estate; (2) relieving the estate of burdensome contracts; (3) promoting the debtor's fresh start; (4) permitting the allowance and determination of claims; and (5) preventing parties from remaining "in doubt concerning their status vis-a-vis the estate." *See Jolly v. Still,* 574 F.2d [349] at 351; *In re Norquist,* 43 B.R. 224, 225, 11 *COLLIER BANKR. CAS.* 2d (MB) 1146 (Bankr.E.D. Wash.1984); H.R.REP. 585, 95th Cong., 1st Sess. 348 (1977) *reprinted in* 1978

> U.S. CODE CONG. & AD. NEWS at 6304. [Footnotes omitted.]

*Id.,* at 868.

The contract before this Court is clearly executory, and pursuant to Bankruptcy Code Section 365 it would clearly be rejectable by the debtor. The debtor's ostensible purpose in rejecting the PolyGram contract is that he may enter into a new recording contract with a subsequent corporation and thus proceed with his life and obtain what the debtor asserts to be his constitutional right for a fresh start. If the above five-point test outlined by the Sixth Circuit in the *Jolly* case is analyzed, clearly the debtor seeks to relieve the estate of a burdensome contract; the debtor is seeking a fresh start, and, pursuant to the rejection of the contract, debtor will be able to determine the amount of his remaining obligations to PolyGram and will be able to determine how the PolyGram claim will be treated in a Chapter 11 plan.

**THE FACT THAT BANKRUPTCY CODE SECTION 541 STATES THAT PROPERTY OF THE ESTATE DOES NOT INCLUDE PERSONAL SERVICE CONTRACTS DOES NOT REMOVE THE POLYGRAM CONTRACT FROM THIS COURT'S JURISDICTION**

Bankruptcy Code Section 541 defines property of the bankrupt estate. Subsection (a)(6) excludes from the estate earnings from services performed by an individual debtor after the commencement of the case. The Congressional history of Section 541, particularly Senate Report No. 95–989 at the time the initial bill was passed in November of 1978, reflects that the commencement of a bankruptcy case creates a specific estate. S.Rep. No. 989, 95th Cong. 2nd Sess. 5–6, *reprinted in* U.S.Code Cong. & Admin.News 5791–92. Said estate is comprised of all legal and equitable interests of the debtor in property wherever located as of the commencement of the bankruptcy proceeding. *Id.*

The bankruptcy estate now includes as property of the estate all property of the debtor, even that needed for a fresh start. After the property comes into the estate, the debtor may exempt it under those ex-

emptions allowed pursuant to the provisions of the Bankruptcy Code. The Bankruptcy Court has the jurisdiction to determine what property may be exempted and what property remains as property of the estate. It is with this general historical perspective in mind that the Code provision of Section 541(a)(6) must be read. Said provision reads as follows:

(a) Such estate is comprised of all of the following property, wherever located and by whomever held: ... (6) proceeds, product, offspring, rents or profits of or from property of the estate, except such as are earnings from services performed by an individual debtor after the commencement of the case.

11 U.S.C. § 541(a)(6).

The fact that Bankruptcy Code Section 541(a)(6) was placed in the Bankruptcy Code as a protection for debtors is very adequately set forth by Judge Babitt in *Matter of Noonan*, 17 B.R. 793 (Bankr.S.D. N.Y.1982). It is a long standing rule that courts of equity will not order specific performance of personal service contracts. 5A *Corbin on Contracts*, § 1203 (1964 ed.); *Restatement (Second) of Contracts*, § 367 (1981).

The Court in *ABC vs. Wolff*, 52 N.Y.2d 394, 438 N.Y.S.2d 482, 420 N.E.2d 363 (1981) noted that the underpinning of the rule forbidding specific enforcement of personal service contracts is the Thirteenth Amendment's prohibition of involuntary servitude. It has been strongly suggested that judicial compulsion of services would violate the express command of that amendment. *See*, Stevens, *Involuntary Servitude By Injunction*, 6 Cornell Law Review, 235 (1921).

Thus, Code Section 541(a)(6) is a fundamental protection built into the Bankruptcy Code for the benefit of debtors. Said protection prohibits creditors from forcing a debtor into future servitude for the payment of debts. Having said that, can said Section 541(a)(6) be justified as a reason for depriving a debtor who meets the other standards of the Code from obtaining the benefits of a Chapter 11 reorganization? This Court finds it cannot.[4] As noted above and conceded in *Noonan, supra*, there is nothing to prevent the debtor herein from filing a Chapter 7 liquidation which would automatically sever the personal service contract before the Court. To recognize said point is to realize that it would be a distortion of the fresh start concept which underpins the entire Bankruptcy Code to deny this debtor an opportunity to reorganize in an orderly fashion.

PolyGram argues strenuously that the future benefits that will arise to the general creditor body should this Court allow a rejection of the PolyGram contract are *de minimus*. PolyGram argues that once relieved of the burden of the current recording contract debtor will enter into a new recording contract and will concentrate all of his efforts toward his future earnings leaving the bankruptcy case to die a slow death. Said argument fails to recognize that pursuant to 11 U.S.C. § 1112, conversion or dismissal of the pending Chapter 11 is under the continuing jurisdiction of this Court. Having sought the protection of this Court pursuant to Chapter 11, it will be the obligation of the debtor to move forward with an equitable plan confirmed in conformance with the Code, or in the alternative to convert this case to a Chapter 7 proceeding. Should the debtor neglect for whatever reason to pursue said course, said options will remain open to the Court as provided under the Bankruptcy Code. Thus, in the future, should this case ultimately be converted to a Chapter 7, the creditor body will find itself in no worse position then it would be in today had the

---

**4.** The Court distinguishes *In re Carrere*, 64 B.R. 156 (Bankr.C.D.Calif.1986). In *Carrere*, the admitted primary motivation for filing Chapter 11 was to free the debtor from one acting contract so she could enter into a new one. The Court noted at page 160, "It would be inequitable to allow a greedy debtor to seek the equitable protection of this Court when her major motivation is to cut off the equitable remedies of her employer."

The matter *sub judice* involves a debtor immersed in substantial debt. This was not a sham filing. Having established that he qualifies as a debtor, Mr. Taylor is entitled to the benefits of Chapter 11.

debtor opted to file a Chapter 7 petition initially.[5] As noted above, said Chapter 7 filing would have voided the PolyGram contract automatically.

## ABSTENTION IS INAPPROPRIATE

 PolyGram and Delightful jointly move to have this Court abstain pursuant to 28 U.S.C. § 1334 from determining the matter before it. Said movants press that the within matter is a noncore proceeding. Inasmuch as this Court has found that it has jurisdiction to allow the debtor to assume or reject the personal service recording and publishing contracts before the Court, this Court, pursuant to 28 U.S.C. § 157(b)(2) finds that the within matter is a core proceeding. The within matter certainly deals with the administration of the estate and is essential to the debtor's ability to move forward with a Chapter 11 plan of reorganization. PolyGram and Delightful would once again use Bankruptcy Section 541(a)(6) as a sword against the debtor to remove this Court's authority to grant the debtor a fresh start pursuant to the provisions of the Bankruptcy Code. This Court finds that it was not the intent of Congress in passing the Bankruptcy Code to carve out one group of individuals, namely those who found themselves bound by personal service contracts chiefly in the show business industry, from the protections of the Bankruptcy Code. Clearly debtor had the right to file a Chapter 7 proceeding, liquidate his assets and automatically reject the contracts before the Court. The objecting creditors would use Section 541(a)(6) to remove from the debtor his other option of filing in lieu of a Chapter 7 liquidation a Chapter 11 reorganization. Insofar as the rejection of the personal service contracts before the Court go to the gravamen and root of this case, this Court has full jurisdiction over this matter and does not abstain.

For the aforesaid reasons, the motions of PolyGram and Delightful to dismiss the pending bankruptcy proceeding or in the alternative to have this Court abstain are denied; the cross-motions of the debtor to reject the executory contracts before the Court involving Delightful and PolyGram are granted.

---

5. Debtor's principal equity asset is his residence. Such property continues under the jurisdiction of this Court and will be available to creditors

should the Chapter 11 fail and the case be converted.