83 N.J. Super. 127 (1964)
199 A.2d 52
JOHN SAROKHAN, PLAINTIFF-RESPONDENT,
v.
FAIR LAWN MEMORIAL HOSPITAL, INC., A CORPORATION OF THE STATE OF NEW JERSEY, SAM GIAMONCO AND NICHOLAS DeVITO, DEFENDANTS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Argued March 9, 1964.
Decided March 26, 1964.
*128 Before Judges GOLDMANN, KILKENNY and COLLESTER.
*129 Mr. James A. Major argued the cause for appellants (Messrs. Major & Major, attorneys).
Mr. Howard Stern argued the cause for respondent (Messrs. Shavick, Thevos, Stern, Schotz & Steiger, attorneys).
The opinion of the court was delivered by KILKENNY, J.A.D.
Pursuant to leave granted under R.R. 2:2-3(a), defendants appeal from an interlocutory order of the Chancery Division, restraining them pendente lite from terminating plaintiff's services as medical director and director of surgery of defendant hospital, from interfering with his rendition of such services, and from doing certain other acts related thereto, as more particularly set forth in the order under review.
Defendant corporation operates for profit a private 63-bed hospital in Fair Lawn, New Jersey. The individual defendants are directors and officers thereof and also of the holding company which owns the land and building, wherein defendant hospital operates as a lessee, at a rental of $14,000 a month. Plaintiff is a doctor and surgeon. He is not a stockholder, director, or officer of and has no financial investment in defendant hospital corporation, or in the holding company.
On April 19, 1962 plainttiff entered into a written agreement with defendant hospital, under the terms of which he was appointed medical director and director of surgery of the hospital for a term of ten years. No salary is specified for these services. The agreement recites that it "may not be revoked or altered by The Hospital during that period" and that plaintiff is bound to the performance of the duties undertaken by him for the ten-year term of the contract. However, in a succeeding paragraph, the agreement provides that, notwithstanding any other provision of the contract, "the parties agree that in the event that two-thirds or more of the stock of The Hospital corporation is sold, that then and in that event The Hospital may, at its option and within thirty days of that event, terminate this contract," subject to plaintiff's *130 right to be retained as a consultant for the remainder of the term of the contract at $10,000 per annum, together with the privilege to conduct his private practice at the hospital as theretofore.
In its preamble, the agreement recognizes the need of a person "knowledgeable in the medical arts and in the processes of medical administration" in the initial stage of organizing and establishing the hospital and that plaintiff has the knowledge and experience to provide such services. His duties included the organizing of a general surgical and medical staff, pathology services and all other services pertaining to the care and treatment of patients, to the end that the hospital would be eligible for accreditation and approval by the American Hospital Association and our State Department of Institutions and Agencies. He was not responsible for the organization of nursing services but, as medical director, was given authority to review the competence and capability of any member of the nursing staff. He was required to use his best efforts to invite to membership on the staff competent medical personnel in all fields in which the hospital was capable of providing service.
The hospital agreed that, within the limits of monetary appropriations authorized for the purpose, plaintiff would have the sole authority to select professional personnel for a period of two years from the date of the acceptance of the first inpatient by the hospital. (The first inpatient was accepted on November 19, 1962). Upon expiration of the two-year period, the selection of professional personnel was to be made in pursuance of bylaws to be established. Plaintiff was given authority to discharge or terminate the appointment of persons on the professional staffs, if he retained such authority at the time of making the appointment. If plaintiff was unable after a reasonable time to provide a full professional staff, then the hospital could choose suitable persons to fill the vacancies. Plaintiff was required, with the advice of members of the various staffs, to prepare all necessary bylaws for the proper administration of the hospital, but the hospital's *131 board of directors had the final authority to approve the bylaws and any amendments thereto.
Recognizing the problems in connection with the initial organization and establishment of proper administration, the hospital agreed that the terms of the contract would not be altered or amended by any bylaw, regulation or directive thereafter established or promulgated by it, but that any such future directive, resolution or bylaw would be consistent with the terms of the contract. Plaintiff was made chairman of the medical executive committee, or other comparable committee established by the bylaws.
By the terms of the agreement, plaintiff undertook to devote to the hospital "sufficient time and effort" to accomplish the initial organization of the medical and surgical services, and thereafter a "sufficient amount of time" to the proper administration of those services. He was not barred from maintaining staff membership on the staff of any other hospital "or from continuing his conduct of the private practice of medicine" at defendant hospital. In connection with his private practice, plaintiff was left free to determine and receive fees for his professional services.
Until September 1963 plaintiff performed his duties without interference by the board of directors. On October 8, 1963 defendant Nicholas DeVito, president of the hospital, wrote a letter to plaintiff inquiring why two men were not appointed assistant medical directors. A reply was received from plaintiff's counsel, stating that plaintiff alone could appoint members to the professional staff and that under no circumstances was he to be considered the agent of the board of directors, or of the president of the hospital. Defendants say that this incident triggered the controversy which led to plaintiff's filing his three-count complaint herein on December 9, 1963. The second and third counts seek money damages as sole remedy for alleged tortious conduct and do not presently concern us. The first count, alleging several acts of allegedly wrongful interference by defendants in the performance of his duties and the exercise of his contractual rights, seeks *132 injunctive relief of the kind specified in the temporary injunction now under review.
After plaintiff instituted this suit, defendant hospital notified him that all association by him with the hospital was at an end. The hospital is dissatisfied with his services, believes that he is responsible for its poor financial condition, and it does not want him any more as its medical director and director of surgery. The hospital directors sum up their complaints as follows:
"1. Undue delay in processing applications by surgeons to unite with the hospital.
2. The attitude of Dr. Sarokhan in feeling that the hospital is for his private benefit.
3. The billing of patients treated in the emergency room of the hospital although no medical services were performed by Dr. Sarokhan.
4. The treating of his private patients at the hospital using the hospital facilities and staff as an adjunct to his private office.
5. The belief that Dr. Sarokhan was dilatory in providing a competent professional staff because this would interfere with the virtual monopoly he has enjoyed in the operating room since the hospital began to function.
6. The feeling on the part of the defendants that Dr. Sarokhan feels he is superior to them and that he is immune to any suggestion concerning either his duties or the manner in which he carries them on."
Defendants take the position that the contract in issue is contrary to public policy in that it would deprive the hospital's board of directors of the powers vested in it by law; and that, if such powers could be granted to plaintiff, the board may recapture them at any time. Defendants feel that they have just cause to terminate plaintiff's services; and, even if just cause were lacking, they have the power to terminate the agency or employment relationship, subject only to an action for damages if, in so doing, there is a wrongful breach of contract. Plaintiff's position is that defendants created an agency coupled with an interest and have neither the right nor the power to terminate during its ten-year term.
In granting the pendente lite injunction, the trial court made no determination as to whether this was or was not an *133 agency coupled with an interest, even though defendants had argued that the contract was merely one of employment and not specifically enforceable. The trial court felt that preliminary relief in favor of plaintiff doctor was warranted to preserve the res or status quo pending final hearing, and that, in balancing the equities, potential irreparable injury to plaintiff's professional reputation outweighed potential monetary loss to defendants. It regarded defendants' contention, that the contract is contrary to public policy, as questionable, in that the directors had delegated authority to plaintiff for a limited time and for a limited purpose. In support of this, Jones v. Williams, 139 Mo. 1, 39 S.W. 486, 40 S.W. 353, 37 L.R.A. 682 (Sup. Ct. 1897), was cited.
The contract herein was one for the rendition of personal services. This is so even though the duties of the job required a person "knowledgeable in the medical arts and in the processes of medical administration," as the contract noted. Personal service contracts are generally not specifically enforceable affirmatively. Equity will not compel performance of the personal services, even where the contract involves a "star" of unique talent, because equity will not make a vain decree. At most, equity will restrain violation of an express or implied negative covenant, thus precluding the performer from performing for somebody else. Lumley v. Wagner, 1 Degex, Mcnaghten & Gordon, 604 (Chan. 1852).
So, too, it is a general rule that agency contracts are not specifically enforceable in a suit brought by the agent against his principal. Fiedler, Inc. v. Coast Finance Co., Inc., 129 N.J. Eq. 161 (E. & A. 1941). Courts are not wont to force a principal to keep an agent against his will, "because the law has allowed every principal a power to revoke his deputation at any time." Wheeler v. Trotter, 3 Swanston, 174 (Chan. 1737). Accord: Alworth v. Seymour, 42 Minn. 526, 528, 44 N.W. 1030 (Sup. Ct. 1890); Hewitt v. Magic City Furniture & Mfg. Co., 214 Ala. 265, 266, 107 So. 745, 44 A.L.R. 1441 (Sup. Ct. 1926). To do so would violate the basic concept in the law of agency, viz., the right of a principal *134 to select his own alter ego, to exercise his delectus personarum.
The mere fact that the appointment recites that it will be irrevocable during the term of the appointment does not preclude the principal from exercising the power to revoke it. Restatement, Agency 2d (1958), § 138. So, too, "it is not necessary for the principal to have any good reasons for his action in revoking the agency, and he may cancel the agent's authority at his caprice, even though the instrument creating the agency contains an express declaration of irrevocability." 3 Am. Jur.2d, Agency, § 37 (1962). This does not mean that the principal may breach such a contract with impunity. For a wrongful breach, the agent may sue at law and recover money damages. 3 Am. Jur.2d, Agency, § 38 (1962). Normally, that is the only remedy available to him. The same rule is applicable to a partnership agreement, a mutual agency relationship in which co-owners carry on a business for profit. Morris v. Peckham, 51 Conn. 128 (Sup. Ct. Err. 1883). N.J.S.A. 42:1-31 (2) allows dissolution of a partnership, "In contravention of the agreement * * * by the express will of any partner at any time." In such a case, the wronged partner has an action for damages. R.S. 42:1-38 (2a II).
The trial court was concerned about the possible injury to plaintiff's professional reputation that might result from termination of the contract. This possible impairment of the agent's reputation, as a basis for ordering specific performance of a personal service contract, was considered by our then highest court in Fiedler, Inc. v. Coast Finance Co., Inc., supra, and rejected. 129 N.J. Eq., at p. 165. Such an element of damage can be proved "with as much accuracy as any unliquidated claim can be ascertained." Ibid. Similarly rejected in Hewitt v. Magic City Furniture & Mfg. Co., supra, was plaintiff's contention therein that specific performance would give him the opportunity to make a reputation for efficiency in the superintendence of defendant's business that would be of great future advantage to him in the business world.
*135 Specific performance of personal service contracts is refused for the further reason that they lack mutuality of enforcement. The employee or agent, reinstated by judicial decree, might abandon his duties on the next day, and a court of equity could not compel him to perform. The wronged principal's only remedy would be an action at law for money damages. Fiedler, Inc. v. Coast Finance Co., Inc., supra, noted that a want of mutuality in the remedy warrants denial of specific performance. "If the enforcement of the obligation may not be granted to both contracting parties, it should not be enforced against one party." 129 N.J. Eq., at pp. 166-167.
The law has recognized, as an exception to the general rule, that "an agency coupled with an interest" cannot be revoked by the principal during the term fixed for its existence. Chapman v. Bates, 61 N.J. Eq. 658, 665 (E. & A. 1900); Miller, Receiver v. Home Ins. Co., 71 N.J.L. 175, 179 (Sup. Ct. 1904); 3 Am. Jur.2d, Agency, § 60 (1962). Even the death of the principal does not terminate it. The best known case setting forth this exception is Hunt v. Rousmanier, 8 Wheat. (U.S.) 174, 5 L.Ed. 589 (1823). In that case, Hunt loaned money to Rousmanier and to secure repayment of the debt the borrower gave the lender a power of attorney to sell a vessel, with authority to deduct from the proceeds the balance due on the loan and turn over the residue to the borrower. The issue was whether the power survived the death of Rousmanier, the giver of the power. The rule was laid down that the death of the principal does not revoke an agency, coupled with an interest.
Defendants concede that, if the contract herein created an agency coupled with an interest, they would not have the power to revoke it. They maintain that such an agency was not created. We agree. The test of an agency coupled with an interest is stated in 2 Williston, Contracts (3d ed.), § 280, pp. 301-302, as follows:
*136 "Does the agent have an interest or estate in the subject matter of the agency independent of the power conferred, or does the estate or interest accrue by or after the exercise of the power conferred?
If the former, it is an agency coupled with an interest, or as has been suggested, a proprietary power; if the latter, it is not."
If the agency is given as security for a debt or obligation, it is regarded as an agency coupled with an interest. Hunt v. Rousmanier, supra; Durbrow v. Eppens, 65 N.J.L. 10, 16 (Sup. Ct. 1900); Restatement, Agency 2d, §§ 138-139 (1958). "In order that a power may be irrevocable because coupled with an interest, it is necessary that the interest shall be in the subject matter of the power, and not in the proceeds which will arise from the exercise of the power." 3 Am. Jur.2d, Agency, § 62. The agency herein was not given as security for some obligation due plaintiff. He had no interest in the subject matter of the power independent of the power conferred. The power conferred by defendant hospital was not one "coupled with an interest." Accordingly, it is not irrevocable, despite the terminology used by the parties.
Jones v. Williams, supra, 39 S.W. 486, relied upon by the Chancery Division and plaintiff, is distinguishable. There, plaintiff gave up his position with a New York newspaper and moved to St. Louis, where he invested his entire capital of $80,000 in exchange for 1667 shares in a newspaper corporation under a contract which appointed him as agent to manage and control the editorial policy of the St. Louis Post Dispatch for a period of five years. The majority of the court refused to allow defendant corporation to revoke the agency, control of the paper being deemed a property right. In the instant case, plaintiff has no similar property right or financial investment in the enterprise to be safeguarded. Moreover, the Missouri court rested its opinion not on a specific finding of an agency coupled with an interest but on a Missouri statute which authorized the grant of an injunction "in all cases where irreparable injury to real or personal property is threatened and to prevent the doing of any legal wrong whatever, whenever *137 in the opinion of the court an alternate remedy cannot be afforded by an action for damages."
In Buck Creek Cotton Mills v. Stokely, 236 Ala. 146, 181 So. 100 (Sup. Ct. 1938), plaintiff's management contract was similarly tied up with his purchase of a large amount of stock in the corporation. The court held that he had an interest in the subject matter, viz., his ownership of stock in the company. In Lane Mortgage Co. v. Crenshaw, 93 Cal. App. 411, 269 P. 672 (D. Ct. App. 1928), the rule of Hunt v. Rousmanier, supra, is approved and the following definition, laid down in an earlier California case, is adopted:
"To impart an irrevocable quality to a power of attorney * * * there must coexist with the power an interest in the thing or estate to be disposed of or managed under the power."
In Lane, plaintiff mortgage company was given a 20-year rent-free lease of the second story of a hotel building, together with an exclusive agency to manage the building, in return for services in procuring a lease and for a loan through which the building was constructed. The court held that plaintiff had been given a "power coupled with an interest," the power being necessary to preserve the property interest. Obviously, Lane is factually different from the matter before us.
In Bowling v. National Convoy & Trucking Co., 101 Fla. 634, 135 So. 541 (Sup. Ct. 1931), also cited by plaintiff, the contract in that case, by which Bowling was made manager, recognized that the business "was wholly attributable to the invention of the manager who was solely responsible for the company's being able to enjoy such business"; that he should receive for his services not only the stipulated compensation, but also a "percentage of the net income"; that he would continue in his position until discontinuance of the business by the company; and that in the event of the manager's death certain compensation would be paid to his personal representatives during the life of the contract. The court held that this contract created an agency coupled with an interest in the business.
*138 A similar property right or estate in the hospital was not created in favor of plaintiff in the instant case. His "know-how" in organizing the hospital cannot be equated with Bowling's inventive genius. Many others could have been engaged by defendants in performing the duties of the employment. The contract itself dilutes his powers after two years and permits termination of his director's authority upon the mere sale of two-thirds of the hospital stock at any time. Thereafter, his only possible right is to the salary of $10,000 per annum as consultant for the balance of the term. He receives no percentage of the income and has no financial investment to secure as in these other cases.
We conclude that the contract in issue did not create an agency coupled with an interest and that defendants had and have the power to terminate it. It becomes unnecessary for us to decide whether the contract contravenes public policy. We make no determination as to whether defendants breached any contractual right of plaintiff in terminating his relationship with the hospital. Those reserved issues will require a plenary trial for resolution, as will the tort claims set forth in the first two counts of the complaint.
The order under review is reversed and the injunction pendente lite is dissolved. The matter is remanded to the Chancery Division for further proceedings not inconsistent herewith.