**In the Matter of James TAYLOR, Debtor. (Two Cases)**

**Appeal of DELIGHTFUL MUSIC LTD.**

**Appeal of POLYGRAM RECORDS, INC., and PolyGram Songs, Inc.**

Civ. A. Nos. 88–4428, 88–4375.

United States District Court, D. New Jersey.

July 28, 1989.

Paul S. Hollander, Peter A. Pizzani, Jr., Okin, Cohen & Hollander, Fort Lee, N.J., for appellee James Taylor.

Richard E. Weltman, Michael L. Moskowitz, Weltman & Moskowitz, New York City, for appellant Delightful Music Ltd.

Richard N. Shaine, Elizabeth Walsh Kreger, Stark & Stark, Princeton, N.J., for appellants PolyGram Records, Inc. and PolyGram Songs, Inc.

## OPINION AND ORDER

POLITAN, District Judge.

This matter comes before the Court as an appeal pursuant to 28 U.S.C. § 158(a) from the Final Order of the Honorable William F. Tuohey, Judge of the United States Bankruptcy Court for the District of New 'Jersey, entered on September 14, 1988. In that Order, Judge Tuohey granted the debtor James Taylor's motion to reject certain executory contracts, including contracts with appellants PolyGram Records, Inc., PolyGram Songs, Inc., and Delightful Music, Ltd. The Order also denied appellants' cross-motions to dismiss Taylor's bankruptcy petition on the grounds that it was filed in bad faith or in the alternative, for abstention from hearing Taylor's motion to reject.

This Court reviews issues of fact determined by the Bankruptcy Court under the "clearly erroneous" standard. *See* Fed.R.Civ.P. 52(a); Rule 8013 of the Rules of Bankruptcy Procedure. *See also In re Morrissey,* 717 F.2d 100, 104 (3d Cir.1983); *Universal Minerals, Inc. v. C.A. Hughes & Co.,* 669 F.2d 98, 102 (3d Cir.1981); *In re Dunes Casino Hotel,* 63 B.R. 939, 944 (D.N.J.1986). Issues of law decided by the Bankruptcy Court are properly reviewed by this Court on a plenary basis. *See Sharon Steel Corp. v. National Fuel Gas Distributors Corp.,* 872 F.2d 36, 38–39 (3d Cir.1989); *In re Computer Communications, Inc.,* 824 F.2d 725, 728 (9th Cir.1987); *Universal Minerals,* 669 F.2d at 102; *Dunes Casino Hotel,* 63 B.R. at 944.

From 1979 until February 1988, James Taylor ("debtor") was the lead singer in a group known professionally as "Kool and the Gang". Through 1988, all contracts and legal relationships for the group were arranged through "furnishing companies". These furnishing companies were the actual contracting entities for the performers. The furnishing companies used by the group most frequently included: Quintet Associates, Inc., a corporation formed by the group's members as the primary vehicle to arrange recording and other performance related contracts; Fresh Start Music, Inc., a corporation through which song publishing was conducted; and a third corporation, variously called Road Gang Enterprises, Inc. and/or Road Gang Associates Ltd., that furnished services of the group in connection with concerts and tours.

Until 1985, the group was contractually obligated to furnish recording and publishing services to De–Lite Recorded Sound Corporation ("De–Lite"). In November 1985, De–Lite assigned its rights under the recording agreement to PolyGram Records, Inc. ("PolyGram"). At that time, the assigned contract was voluntarily terminated and a new agreement for the exclusive recording services of the group was executed between PolyGram and Quintet. In exchange for the group's services, Poly-Gram agreed to pay certain royalties to Quintet based on sales of the group's recordings. In addition, PolyGram agreed to advance funds to the group to cover living and recording expenses with the expectation that these funds would be recouped from future royalties.

At about the same time, Quintet executed a music-publishing agreement with De–Lite's affiliate, Delightful Music Ltd. ("Delightful"). Under this agreement, De-lightful was given an exclusive grant of worldwide copyrights in all of the musical compositions written and recorded by the group for up to an eight album term. In return, Delightful was obligated to provide various services, including collecting performance fees and accounting for all monies received.

A third agreement was executed in November 1986 between Fresh Start and Poly-Gram Songs, Inc. Under the terms of this agreement, Fresh Start would furnish the services of group members as songwriters. For this service PolyGram Songs agreed to pay royalties for songs written by a group member but not recorded by the group.

Each of these three contracts contained a "leaving member clause" binding each individual member of the group to perform as a solo artist under the terms of the respective contracts in the event of his departure from the group. In addition, the individual members of the group, including the debtor, were required to sign "inducement letters" in connection with the PolyGram recording contracts. Under the terms of the inducement letters, a member departing from the group was obligated to furnish his services directly to PolyGram, in the event that Quintet was unable to provide the services of the leaving member.

Taylor last performed as an artist with Kool and the Gang in early February 1988. At about the same time the debtor opened discussions with PolyGram concerning his future as a solo performer. On February 8, 1988, PolyGram wrote to Quintet and advised Quintet that it was exercising its rights to continue as the recording company for Taylor pursuant to the inducement letter and "leaving member" provisions of the Quintet recording contract. The debtor was also obligated to perform under the other contracts with Delightful and Poly-Gram Songs. On February 16, 1988, the debtor wrote to the manager of the group and revoked a general power of attorney held by the manager.

The financial events which ultimately lead the debtor to seek relief under Chapter 11 of the Bankruptcy Code arose out of cash flow problems experienced by Kool and the Gang starting in 1986. By October of that year Kool and the Gang entities had accumulated debts in excess of $1,719,000, exclusive of any advances on royalties from PolyGram. The groups' financial problems continued into 1987 when they entered into a loan and security agreement with PolyGram by which PolyGram advanced an additional $500,000 to Quintet. At a meeting held in December 1987 the group was presented with a report listing currently outstanding bills. This list reflected outstanding loans and accounts payable owed by the group of $3,352,109. The report noted that this sum did not include PolyGram advances which, at the time, were approximately $950,000. Of the debts owed by the various Kool and the Gang entities, certain debts had been personally guaranteed by members of the group, including the debtor. Three of these loans are at issue in this case: a loan from First InterCounty Bank in the amount of $515,000; a second loan from First City National Bank in the amount of $265,000; and several advances from Norby Walters totalling $514,000.

On May 24, 1988 James Taylor filed a petition for relief pursuant to Chapter 11 of

the Bankruptcy Code in the United States Bankruptcy Court for the District of New Jersey. On June 13, 1988 Taylor filed a Motion for Authority to Reject certain executory contracts, including the PolyGram Recording Agreement, the PolyGram Co–Publishing Agreement, the Delightful Publishing Agreement, and any other written or oral executory agreements between Taylor and the Kool and the Gang entities. In response to this motion, appellants Delightful and PolyGram filed a cross-motion seeking dismissal of the debtor's Chapter 11 petition as having been filed in bad faith or, in the alternative, abstention by the Bankruptcy Court from hearing the debtor's motion to reject in accordance with § 305 of the Bankruptcy Code. The Bankruptcy Court issued its Opinion and Order on September 14, 1988, granting the debtor's motion to reject the executory contracts and denying appellants' motion to dismiss and for abstention. PolyGram filed a Notice of Appeal on September 20, 1988 and Delightful filed its Notice of Appeal on September 26, 1988. Although not formally consolidated, these two appeals raise similar issues regarding the rejection of personal service contracts and the filing of the Chapter 11 petition in bad faith. Because of the similarity of issues presented, this Court's Opinion applies with equal force to the appeal of PolyGram as well as Delightful.

## I. REJECTION OF EXECUTORY CONTRACTS

◼ The primary issue before the Court on this appeal is whether a debtor's executory personal service contracts may be rejected in a bankruptcy proceeding.[1] Appellants PolyGram and Delightful argue that the Bankruptcy Court erred in permitting rejection of the executory personal service contracts because such contracts are not part of the debtor's estate under § 541 of the Code and therefore the trustee

has no power to act on these contracts. Moreover, appellants argue that under § 365(c)(1)(A) of the Bankruptcy Code, the trustee is precluded from rejecting a personal service contract because that section speaks only to assignment or assumption of such contracts. Because the provision does not specifically address rejection of such contracts, appellants argue that the trustee has no authority to take such action. The debtor, on the other hand, argues that executory contracts for personal services must be rejected upon the filing of a petition in bankruptcy because, under principles of nonbankruptcy law, such contracts cannot be assumed by the trustee. The debtor argues that to hold otherwise would frustrate an important purpose of the Bankruptcy Code: to ensure the debtor a "fresh start" after filing a petition for relief.

The issue before this Court is one of first impression and there is no caselaw on point in this Circuit or any other circuit for the Court to consider. This Court concludes that executory personal service contracts can be rejected in any bankruptcy proceeding filed in good faith.

◼ Section 541 of the Bankruptcy Code defines property of the bankrupt estate as "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1) (1982 and Supp. V 1987). An exception to the broad sweep of this provision is established for "earnings from services performed by an individual debtor after the commencement of the case." 11 U.S.C. § 541(a)(6) (Supp. V 1987). Under this exception, the debtor's post-petition earnings for performance under his personal service contracts are not considered property of the estate. It is unclear at this stage whether personal service contracts themselves are to be included in the bankrupt's estate at the com-

---

**1.** Although the Bankruptcy Code contains no definition of an executory contract, courts have generally relied on the following definition: "[An executory contract is] a contract under which the obligation of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete

performance would constitute a material breach excusing performance of the other." Countryman, *Executory Contracts in Bankruptcy*, Part 1, 57 Minn.L.Rev. 439, 460 (1973). This Court concludes, and the parties do not dispute, that each of the contracts at issue in this case fall within the definition of "executory contract".

mencement of the case. However, it is logical to conclude that if the debtor's earnings under these contracts are not part of the estate, the contracts also should not be considered part of the estate at the commencement of the case.

Pursuant to 11 U.S.C. § 365(a), the trustee[2] "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a) (Supp. V 1987). This language, by its express terms, permits the assumption or rejection of all executory contracts; no distinction is made between contracts which are part of the debtor's estate and those which are not so included at the time of commencement of the case. The trustee's general power to assume or reject any executory contract is limited only when additional restrictions or limitations have been established in the Bankruptcy Code.

■ Subsection (c)(1) of § 365 establishes specific limitations on the trustee's ability to assume or assign specific types of executory contracts. It is generally accepted that this subsection applies, *inter alia*, to executory personal service contracts. *See* 2 *Collier on Bankruptcy*, ¶ 365.05 at 365–42 (15th ed. 1987); *see also In re Pioneer Ford Sales, Inc.*, 729 F.2d 27 (1st Cir.1984); *In re Braniff Airways Inc.*, 700 F.2d 935, 943 (5th Cir.1983). Subsection (c)(1) is apparently designed to prevent the trustee from assuming or assigning an executory contract when applicable nonbankruptcy law precludes such action, *see* 11 U.S.C. § 365(c)(1)(A); *see also Pioneer Ford*, 729 F.2d at 28, unless the party accepting performance consents to such assumption or assignment.[3] *See* 11 U.S.C. § 365(c)(1)(B). This provision merely qualifies the general power of the trustee to assume or assign "any executory contract". There is no indication, either in § 365 or any other relevant provision of the Code, that the trustee's general power to reject "any executory contract" is similarly limited or restricted. In the instant case, then, this Court must determine whether the trustee has the power to reject executory contracts which technically are not part of the debtor's estate. If rejection is not available, then the contracts pass outside the bankrupt's estate and the debtor remains obligated to perform under the original terms.

■ The concept of rejection of executory contracts has its roots in the principle that the trustee in bankruptcy may renounce title to and abandon burdensome property if such action is deemed to be in the best interests of the estate. *See* 2 *Collier*, ¶ 365.01 at 8.1—8.2. As noted above, the basic power to reject executory contracts is set forth in § 365(a), which states only that the decision of the trustee is "subject to the court's approval." 11 U.S.C. § 365(a). Except for cases involving collective bargaining agreements, intellectual property and real property leases, there are no special provisions or guidelines to be followed for rejection of most executory contracts.[4] *See Sharon Steel*,

**2.** Upon filing of a petition for relief under 11 U.S.C. § 1101, *et seq.*, Taylor became a debtor-in-possession. Since no trustee has been appointed in this case, the debtor-in-possession exercises the majority of powers possessed by a trustee. *See* 11 U.S.C. §§ 1107, 1106. Functioning much like a trustee, Taylor, as the debtor-in-possession, is granted certain administrative powers and, so far as relevant, this includes the power to assume or reject executory contracts. *See* 11 U.S.C. § 365.

**3.** Under a personal service contract, the receiving party relies on the personality of a specific individual for the completion of performance. Because the contract is premised on the artistic skill or unique abilities of a specific party, the duty to perform under the contract generally is not assignable. *See* J. Calamari & J. Perillo,

*The Law of Contracts*, § 18–26 at 760 (3d ed. 1987).

In this case, therefore, the trustee is precluded by nonbankruptcy law from assuming or assigning the debtor's personal service contracts. In addition, it does not appear from the record that the appellants are willing to consent to any assignment or assumption of the debtor's personal performance obligations. As a result, the debtor's personal service contracts are not part of the estate.

**4.** In fact, there is no indication, in either the legislative history of the Code or the relevant caselaw, that personal service contracts are intended to be outside the scope of the general provision allowing rejection of "any executory contract." *See In re Bildisco*, 465 U.S. 513, 522–

872 F.2d at 40; 11 U.S.C. §§ 365, 1113. Courts generally have taken a flexible approach. The only test employed to aid in judicial review of the trustee's decision to reject is that rejection of the contract benefit the estate. *See Sharon Steel,* 872 F.2d at 39–40. This test is commonly referred to as the "business judgment test". *See Sharon Steel,* 872 F.2d at 39–40; *In re Wheeling—Pittsburgh Steel Corp.,* 72 B.R. 845, 846 (Bankr.W.D.Pa.1987). In this case, however, modification of the traditional "business judgment test" is necessary. If rejection of the personal service contract is prohibited, the burden falls not on the estate, but on the debtor who must then perform under the original terms of the contract. Thus, rejection should be permitted if it is in the best interests of the debtor.[5]

■ To find that a trustee is not permitted to reject a personal service contract is to force the debtor into involuntary servitude. The Court, in effect, would be ordering specific performance of the executory personal service contract. Such an order is prohibited by longstanding doctrines developed in numerous jurisdictions. For example, the New York Court of Appeals, in summarizing the rules and regulations that have developed in this area, observed that

> [c]ourts of equity historically have refused to order an individual to perform a contract for personal services. Originally this rule evolved because of the inherent difficulties courts would encounter in supervising the performance of uniquely personal efforts. During the Civil War era, there emerged a more compelling reason for not directing the performance of personal services: the Thirteenth Amendment's prohibition of involuntary servitude. It has been strongly suggested that judicial compulsion of services would violate the express command of that amendment.

*American Broadcasting Co., Inc. v. Wolf,* 52 N.Y.2d 394, 401–02, 438 N.Y.S.2d 482, 420 N.E.2d 363 (1981) (citations and footnotes omitted). *See Sarokhan v. Fair Lawn Memorial Hospital, Inc.,* 83 N.J.Super. 127, 133, 199 A.2d 52 (App.Div.1964); *The Law of Contracts,* § 16–5 at 666–67.

In the instant case, the debtor is obligated to work as an individual performer under three recording contracts pursuant to the "leaving member" and "inducement letter" clauses in the respective agreements. The debtor also remains personally liable for all advances made to the group over the past few years. As a result, any royalties earned from the debtor's individual performances can be used to offset the more than $900,000 advanced to the group by the recording companies prior to the debtor's terminating his relationship with Kool and the Gang. Allowing the debtor to remain liable for these advances is inconsistent with the principle of allowing the debtor a "fresh start". In addition, the Court recognizes that enforcing the performance obligations under the recording contracts would force the debtor into involuntary servitude under the personal service contracts. Therefore, this Court concludes that it is in the best interests of the debtor to allow rejection of his executory personal service contracts.[6]

In reaching this result, this Court cautions that it does not establish a hard and fast rule to be applied in every case. Implicit in the debtor's exercise of the option to reject executory personal service contracts is an obligation that the debtor's bankruptcy petition is filed in good faith

---

23, 104 S.Ct. 1188, 1194, 79 L.Ed.2d 482 (1984) (rejecting notion that collective bargaining agreements are not included within the general scope of § 365(a)). Following the Supreme Court's decision in *Bildisco,* § 1113 was enacted to clarify treatment of collective bargaining agreements in bankruptcy. *See* 1984 U.S.Code Cong. and Admin.News 576.

**5.** This provides a mechanism for relief which consistent with the underlying purpose of the Code to allow the individual debtor to obtain a

fresh start. *See* H.R.Rep. No. 959, 95th Cong., 1st Sess. 125, *reprinted in* 1978 U.S.Code Cong. & Admin.News 5787, 5963, 6086; *see also Perez v. Campbell,* 402 U.S. 637, 648, 91 S.Ct. 1704, 1710–11, 29 L.Ed.2d 233 (1971).

**6.** This result is also consistent with the proceeding under Chapter 7 of the Bankruptcy Code where all executory contracts not assumed or assigned by the trustee are automatically rejected within 60 days from the filing of the debtor's petition. *See* 11 U.S.C. § 365(d).

with a valid reorganizational purpose.[7] A requirement of good faith in the initial filing of a bankruptcy petition prevents abuse by debtors whose overriding motive is use of the bankruptcy process for reasons other than relief from overwhelming obligations. If the debtor's petition is filed in good faith with a proper reorganizational intent, the personal services executory contract may be rejected by the Bankruptcy Court.[8]

## II. LIABILITY FOR CONTINGENT OBLIGATIONS

Appellants also maintain in their appeal that the Bankruptcy Court's Opinion and Order was in error because the Court made findings based on evidence not in the record and ignored or improperly applied relevant law when reviewing and analyzing the three principal contingent liabilities of the debtor—the First InterCounty Bank of New York loan, the First City National Bank & Trust Co. loan, and the loan from Norby Walters.

 Addressing the First InterCounty obligation, the Bankruptcy Court concluded that this obligation qualified as a legitimate contingent liability owed by the debtor. *See In re Taylor*, 91 B.R. 302, 308 (Bankr.D.N.J.1988). The Court based its conclusion on the fact that the entire sum was backed by a loan guaranty personally signed by the individual members of the group Kool and the Gang, including the debtor.[9]

 Under the terms of the First InterCounty Bank guaranty signed by the debtor, the bank is expressly given the right to modify, renew or alter in any way the terms of the underlying indebtedness. Subsequent to the debtor signing this guar-

7. A standard of good faith for the commencement, prosecution and confirmation of bankruptcy proceedings has been incorporated either literally or by judicial interpretation in every bankruptcy statute since 1898. *See In re Victory Constr. Co.*, 9 B.R. 549, 551–60 (Bankr.C.D.Cal. 1981) (historical survey); *see e.g.*, *Fidelity Assur. Assoc. v. Sims*, 318 U.S. 608, 621, 63 S.Ct. 807, 813, 87 L.Ed. 1032 (1943). Such a standard furthers the balancing process between the interests of the debtor and the interests of the creditors.

8. Two Bankruptcy Courts addressing an issue similar to that presented in the instant case have reached seemingly inconsistent results. In *In re Noonan*, 17 B.R. 793 (Bankr.S.D.N.Y.1982), the court denied a motion to reconvert the debtor's Chapter 7 proceeding to a Chapter 11 proceeding. In its analysis, the Court discussed the issue of rejection of the debtor's executory personal service contract. The court recognized that the trustee "does not take title to the debtor's rights and cannot deal with the contract." *Id.* at 797–98. However, the contract at issue called for purely personal services and the debtor could not be compelled to abide by its terms unless he agreed to be bound. To avoid compelling specific performance of the personal service contract, the court concluded that the contract *must* be rejected. *See id.* at 799.

In *In re Carrere*, 64 B.R. 156 (Bankr.C.D.Cal. 1986), the debtor filed a voluntary petition under Chapter 11 of the Bankruptcy Code. In subsequent submissions, the debtor made it clear that her primary motivation in seeking the protection of the Bankruptcy Court was to reject an executory personal service contract so as to enter into a more lucrative contract with anoth-

er company. The Court stated "since the trustee has no interest in the contract, he has no standing to act at all under § 365. Therefore, he cannot assume or reject the contract." *Id.* at 159. Later in its opinion, the Court noted that it would be inequitable to allow a greedy debtor to seek the equitable protection of the Bankruptcy Court "if the major motivation of the debtor in filing the case was to be able to perform under a more lucrative [contract with another company]." *Id.* at 160.

Application of the standard established by this Court in this case to the facts of *Carrere* results in the same conclusion as reached by the *Carrere* court—that the executory personal service contract cannot be rejected if the bankruptcy petition is filed in bad faith.

9. Appellants argue at great length that the guaranty on the First InterCounty loan was not in evidence before the Bankruptcy Court and as a result, the finding that the debt was a legitimate contingent liability of the debtor was clearly erroneous. It appears, however, from a thorough review of the record, that this particular guaranty was presented to the Bankruptcy Court without objection at the time of oral argument. *See* Transcript of Proceedings, August 5, 1988, p. 62, 1.5–18. In addition, the document was attached as Exhibit B to a supplemental memorandum submitted to the court on August 12, 1988 in support of the debtor's motion to reject. This Court is of the opinion that presentation of the document to the Court during the proceeding without objection by opposing counsel is tantamount to admission as evidence. Therefore, the document was properly before the Court for consideration in this matter.

anty, the repayment terms of the original obligation in fact were modified by a settlement agreement between the parties to extend the time for repayment. Where a guarantor has given prior consent to changes, modifications, extensions or renewals of the underlying obligation, he is not released by a subsequent agreement which simply modifies the terms for repayment of the underlying note. *See National Bank of North America v. Sobel*, 31 A.D.2d 750, 297 N.Y.S.2d 476, 477–78 (App. Div.1969); *see also* Restatement of Security, § 129(1) comment b (1941).

Appellants argue that the Bankruptcy Court failed to consider Paragraph 10 of the subsequent settlement which provides that the "agreement constitutes the entire understanding between the parties, and merges and supersedes any prior agreements, negotiations or discussions concerning the parties...." Appellants argue that this language creates a novation discharging the debtor's prior guaranty, including its consent language. Because the debtor's prior guaranty has been discharged, the debtor's liability has also been discharged.

■ Appellants' argument suffers a fatal flaw. An essential element of any novation is that the substituted contract include as a party one who was neither the obligor nor the obligee of the original duty. *See* Restatement (2d) Contracts, § 280 (1979); *The Law of Contracts*, § 21–8 at 873. The settlement agreement, executed in April 1988, provided for repayment of the First InterCounty debt by the Kool and the Gang group and was signed by each individual member, except the debtor. Because no new additional party was made part of the substituted agreement, the doctrine of novation does not apply and the debtor remains obligated under the prior guaranty.

■ The second obligation attacked by the appellants arises out of a $250,000 loan undertaken by the Kool and the Gang group from First City National. In its Opinion, the Bankruptcy Court included a brief description of the facts giving rise to this obligation and then stated that this debt is among the obligations of the "debtor's tangled web of finances" due to "promissory notes and guarantees signed by the debtor." 91 B.R. at 309. The Bankruptcy Court made no analysis of the debtor's personal liability for this loan in its September 14th Opinion.

In his deposition, the group's manager, Gerard Delet testified that the First City National Bank loan represented a refinancing of a portion of the debt originally owed to the First InterCounty Bank. *See* Deposition Transcript, July 18, 1988, p. 268, 1.1–16. Acting under a general power of attorney, Delet signed the debtor's name to a personal guaranty of this debt to First City National Bank. *See id.* at p. 270, 1.6–14. When the loan was in default, a stipulation of settlement with First City was entered into by the debtor's former manager, Mr. Delet. This stipulation of settlement extended the time for payment of the bank's obligation. Appellants raise the same arguments as made above for the First InterCounty Bank loan, stating that the stipulation of settlement operates to discharge the debtor's liability as a guarantor because it extends time for payment of the underlying obligation. For reasons previously discussed, this Court concludes that the debtor remains obligated pursuant to a valid personal guaranty on the underlying obligation with First City National Bank.

■ The third ruling challenged by appellants on this appeal concerns money owed to Norby Walters. Regarding this debt, the Bankruptcy Court found that Walters loaned money to the group through a series of promissory notes on which the individual group members were personally liable. On February 15, 1988, the individual members of the group, excluding Taylor, executed a new promissory note in the sum of $425,000 representing the outstanding balance due Norby Walters. The Bankruptcy Court stated "the record is not clear as to whether Norby Walters has waived any of his rights on the aforesaid promissory notes executed by the debtor, James Taylor, and whether by accepting the promissory note of February 15, 1988, in the sum of $425,000, as a

matter of law, Walters, has, in fact, waived his rights against Taylor." 91 B.R. at 308.

█ The execution of a renewal note does not discharge the obligations created under a prior note unless the parties express a contrary intention at the time of execution of the renewal note. *See Bank of New York v. Cerasaro,* 98 A.D.2d 902, 470 N.Y.S.2d 894, 896 (3d Dept.1983); *see also Peterson v. Crown Financial Corp.,* 661 F.2d 287, 291 (3d Cir.1981). In *Bank of New York,* the Appellate Division of the New York Supreme Court stated "[i]t is well established that a subsequent note does not discharge the original indebtedness secured unless there is an express agreement between the parties." 470 N.Y. S.2d at 896 (citations omitted). In addition, "there is a strong presumption against an intent that the subsequent note was for payment." *Id.* at 896 (citations omitted). The record before the Court does not indicate that there was ever an express agreement to release Taylor from liability on the original note when the February 1988 note was executed. In addition, appellants offer no evidence sufficient to overcome the strong presumption that the subsequent note was not intended as payment for the original debt.

█ Appellants' argue on appeal that the debtor signed the original note in the capacity of an accommodation maker for the purpose of lending his name to the principal borrower, Road Gang Enterprises, Inc. *See N.Y.U.C.C.Law,* § 3–415(1) (McKinney 1978). Because the debtor did not sign the renewal note, appellants argue he is relieved of liability unless the lender knew of the prior suretyship status of the debtor and expressly reserved the right to recover against him. *See N.Y.U.C.C.Law,* § 3–606(1)(a) (McKinney 1978).

A review of the original notes signed by the debtor and other members of the group indicates that their role in signing the notes was not limited to accommodation makers. While the advances were technically made to Road Gang Enterprises, Inc., the promissory notes expressly made each member of the group jointly and severally liable for the entire amount of funds loaned. In addition, the status of Road Gang as a "furnishing company" under the direct control of the group indicates that the individual group members were the actual beneficiaries of the funds loaned by Walters. Therefore, the Bankruptcy Court was correct in concluding that the debtor remains personally obligated for money advanced by Norby Walters pursuant to original promissory notes.

### III. BAD FAITH

█ Appellants object to the Bankruptcy Court's characterization of their bad faith argument as based solely on lack of debt to justify a petition filed pursuant to Chapter 11 of the Bankruptcy Code. Appellants also argue that in light of the totality of circumstances surrounding the debtor's filing of a Chapter 11 petition, the Bankruptcy Court should have dismissed the proceeding as being initiated in bad faith. Appellants point to numerous "indicia of bad faith". Included among these indicia of bad faith are the debtor's apparent lack of a pressing need to reorganize; the debtor's personal assumption of liability for the lease payments of a 1987 Mercedes 560 SEL at a monthly cost in excess of $1,600; the circumstances surrounding the debtor's mortgage loan from Broadway Bank immediately prior to his filing the Chapter 11 petition; obvious inconsistencies on financial statements and schedules listing creditors and outstanding debt obligations immediately prior to filing the Chapter 11 petition; negotiations with appellants' competitors while still under an exclusive performance obligation; and other instances indicating that the debtor's real purpose in filing a petition pursuant to Chapter 11 was to reject the contractual obligations of the personal service contracts · and procure a more lucrative performance contract with another organization.

Though the Bankruptcy Code does not explicitly authorize courts to dismiss cases filed in bad faith, case law overwhelmingly supports the Bankruptcy Court's power to dismiss a Chapter 11 case for "cause" pursuant to 11 U.S.C. § 1112(b). *See Moody v.*

*Security Pacific Business Credit, Inc.*, 85 B.R. 319 (W.D.Pa.1988); *In re Southern California Sound Systems, Inc.*, 69 B.R. 893, 899 (Bankr.S.D.Cal.1987). A determination of the debtor's bad faith depends largely on the Court's evaluation of the debtor's financial condition and motives surrounding the filing of the petition. *See In re Little Creek Development Co.*, 779 F.2d 1068, 1072 (5th Cir.1986). The existence of bad faith depends not on the presence of any one specific factor but on a combination of factors after careful examination of the facts of the debtor's case.

This Court concludes, after a thorough review of the debtor's petition and the surrounding circumstances, that the debtor's current financial condition justifies the filing of a voluntary petition in bankruptcy. Specifically, the petition lists liabilities totalling $4,518,701.50 ($2,530,732—secured claims; $1,987,969.50—unsecured claims), and assets totalling only $734,215.00. As discussed above, many of the listed liabilities are obligations for which the debtor may be personally liable. In fact, the three contingent liabilities already discussed total over $1.2 million, and alone establish sufficient debt to justify bankruptcy. The "other indicia of bad faith" to which appellants refer are of peripheral importance and, in any event, either collectively or individually, do not compel a contrary conclusion.

For the foregoing reasons, the decision of the Bankruptcy Court is AFFIRMED.

SO ORDERED: