**In the Matter of James TAYLOR, Debtor.**

**DELIGHTFUL MUSIC LTD., Appellant,**

v.

**James TAYLOR, Appellee.**

**No. 89–5700.**

United States Court of Appeals, Third Circuit.

Argued June 25, 1990.

Decided Sept. 4, 1990.

▆▆▆▆▆▆▆

Michael L. Moskowitz (argued), Richard E. Weltman, Weltman & Moskowitz, New York City, for appellant.

Paul S. Hollander (argued), Peter A. Pizzani, Jr., Okin, Cohen & Hollander, Fort Lee, N.J., for appellee.

Before SLOVITER and MANSMANN, Circuit Judges, and FULLAM, District Judge.[*]

### OPINION OF THE COURT

FULLAM, District Judge.

James Taylor, as debtor-in-possession in this Chapter 11 bankruptcy proceeding, sought the bankruptcy court's approval of his decision to reject certain executory contracts, including a music-publishing agreement dated November 13, 1985, between the debtor and the appellant, Delightful Music, Ltd. The latter objected, moved to dismiss the bankruptcy petition, and requested the court to abstain from ruling on the rejection request.

The Bankruptcy Court granted permission to reject the executory contract, and refused to dismiss the bankruptcy petition

---

[*] Honorable John P. Fullam of the United States District Court for the Eastern District of Pennsylvania, sitting by designation.

or abstain. The district court upheld these rulings, *In re Taylor*, 103 B.R. 511 (D.N.J. 1989), and Delightful now appeals.

■■■ Under 28 U.S.C. § 158(d), this court has jurisdiction to review "final" orders. In the bankruptcy context, finality is accorded a somewhat flexible, pragmatic definition, see, *In re Comer*, 716 F.2d 168, 171 (3d Cir.1983). The order approving rejection of appellant's contracts fully and finally resolved a discrete set of issues, leaving no related issues for later determination; we conclude that that order is final and appealable for purposes of § 158(d) and 28 U.S.C. § 1291. *See generally, Century Glove v. First Amer. Bank of N.Y.*, 860 F.2d 94, 97–99 (3d Cir.1988). The order refusing to dismiss the bankruptcy petition is likewise appealable, *In the Matter of Christian*, 804 F.2d 46 (3rd Cir.1986).[1]

This appeal presents an issue which has not previously been addressed in any reported appellate decision, namely, whether executory contracts for the personal services of the debtor may be rejected under § 365 of the Bankruptcy Code. Appellant argues that personal-service contracts are not, and cannot become, part of the estate being dealt with in the bankruptcy court, and therefore cannot be rejected or otherwise affected in a Chapter 11 proceeding. Alternatively, appellant argues that rejection should not have been permitted in this case because it was not sought in good faith and would not benefit the estate. A final argument is that the bankruptcy petition should have been dismissed because the debtor was not insolvent at the time the petition was filed, and lacked a genuine reorganization purpose, and because the petition was not filed in good faith.

## I. *Factual Background*

James Taylor is a well-known professional musician and entertainer. From 1979 until mid-February 1988, he served as the lead singer and principal songwriter in a group known as "Kool and the Gang" ("The Group").

The services of The Group were furnished pursuant to various contracts arranged through "furnishing companies"—corporate entities in which various members of The Group held ownership interests. Thus, Quintet Associates, Ltd. was a corporation formed by the members of The Group to handle its recording contracts. Fresh Start Music, Inc. handled The Group's musical publishing business. A third corporation, variously known as Road Gang Enterprises, Inc. and/or Road Gang Associates, Ltd., arranged The Group's concerts and tours.

Until 1985, Quintet contracted to provide The Group's exclusive recording services to DeLite Recorded Sound Corp., and the individual members of The Group were required to furnish their recording services to Quintet so that Quintet could fulfill its contractual obligations to DeLite. In 1985, DeLite assigned its rights to Polygram Records, Inc., which entered into a new agreement with Quintet. Mr. Taylor and the other individual members of The Group executed "inducement letters" assenting to these arrangements. Concomitantly, Quintet entered into a music-publishing agreement with the appellant, Delightful Music, Ltd., which was a corporate affiliate of DeLite. This arrangement, too, was sanctioned by "inducement letters" executed by Mr. Taylor and other members of The Group.

In November 1986, similar arrangements were concluded between Fresh Start and Polygram for the services of Group members as songwriters; by this agreement, Polygram was required to pay royalties for songs written by Group members but not recorded by The Group.

In consequence of these contractual arrangements, appellant obtained the exclusive worldwide copyrights in all of the musical compositions of The Group, and of Mr. Taylor as a principal writer for The Group. Appellant was obliged to secure and protect copyrights, make master recordings

---

1. But the order denying the motion to abstain is, by the express terms of the statute, not appealable. 11 U.S.C. § 305(c). Insofar as the appellant challenges the abstention decision, the appeal will be dismissed.

and other audio-visual reproductions of The Group's compositions, print, publish and sell sheet music of The Group's compositions, market these products and issue licenses, and collect performance fees. And Mr. Taylor was contractually obligated to compose and perform, as a principal member of The Group, musical compositions sufficient to produce at least eight record albums (subject to various options). In the event Mr. Taylor should terminate his membership in The Group, he would remain personally liable to fulfill his remaining obligations as a solo artist—*i.e.*, to compose and perform enough musical compositions to produce the required minimum number of albums—under a "leaving member clause" in the pertinent agreements.

Upon completion of a February 1988 tour of The Group, Mr. Taylor left The Group to pursue a solo career. The bankruptcy petition was filed on May 23, 1988. At that time, only one album had been released.

Beginning at least as early as 1985, The Group and its various related corporate entities experienced financial difficulties, apparently due in large part to life-styles involving unduly lavish expenditures, in excess of the substantial income generated by their performances. They borrowed money, from banks, their agent, and their pension funds, and these advances were secured by assignments of future revenues under the recording agreements, as well as by the personal guarantees of The Group members, including Mr. Taylor.

When the bankruptcy petition was filed, Mr. Taylor was in the following unenviable position: he was owed substantial amounts by Group entities, but with virtually no prospect of payment; he was contractually obliged to write and perform enough musical compositions to provide at least seven additional albums, but any revenues these efforts might generate would be retained by The Group's creditors; and he had personally guaranteed the obligations of The Group and its related entities in amounts greatly in excess of the remaining equity in his home, which was his only significant asset.

## II. *Dismissal of the Bankruptcy Petition*

If the bankruptcy court and district court erred in refusing to dismiss the bankruptcy proceeding in its entirety, the issue of contract-rejection would be moot. We therefore first address the dismissal question.

■ In affirming the bankruptcy court's refusal to dismiss the petition, the district court found that the "debtor's current financial condition justifies the filing of a voluntary petition in bankruptcy". *Taylor*, 103 B.R. at 521. The court noted that the bankruptcy petition lists liabilities totaling $4,518,701.50 ($2,530,730 secured, $1,987,-969.50 unsecured), and assets totaling only $734,215. The court further concluded that appellant had not established that the petition was filed in bad faith. We review the factual component of these findings under the clearly erroneous standard, and the legal component *de novo*.

■ Appellant contends that, if the personal liabilities of the debtor had not been improperly confused with the debts of the various Group entities, and if the debtor's personal liabilities had been properly evaluated to reflect their contingent nature, the debtor's financial picture would not be nearly bleak enough to warrant filing for bankruptcy; in addition, appellant argues, *inter alia*, that many of the listed liabilities are not enforceable against the debtor for various reasons: that the debtor was merely an accommodation-maker, whose liability was extinguished by the acts of the other parties; and that the debtor's obligations had been canceled by virtue of novations or settlement agreements. We reject these arguments.

Even if debtor's contingent liabilities (approximately $1.2 million in amount) were disregarded, his debts would greatly exceed his assets.[2] Moreover, appellant's argument rests upon an unduly optimistic

---

**2.** Of course, if later facts adduced before the bankruptcy court present a different financial picture, the statute permits the court to reconsider the appropriateness of dismissal. *See* 11 U.S.C. § 305(a).

view as to the remoteness of the contingency. The district court expressly found that the debtor was not a mere accommodation party—he was, after all, personally guaranteeing repayment of loans to Group entities (owned by The Group members) for the direct benefit of the members of The Group, himself included. Whether a novation occurred as to certain of these guaranty transactions depends upon the intent of the parties. This is a factual question, and the findings set forth in the record are not clearly erroneous.[3]

In short, we conclude that the order appealed from, to the extent appellant's motion to dismiss the bankruptcy proceeding was denied, must be affirmed.

### III. *Rejection of Executory Contracts for Personal Services*

As set forth in § 1107, a debtor-in-possession in a Chapter 11 proceeding has the same powers with respect to executory contracts as a trustee. And 11 U.S.C. § 365 provides as follows:

> "(a) Except as provided [in subsection (c) of this section], the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor.
>
> " . . .
>
> "(c) The trustee may not assume or assign any executory contract or unexpired lease of the debtor . . . if—
>
> "(1)(A) applicable law excuses a party, other than the Debtor, to such contract or lease from accepting performance from or rendering performance to an entity other than the debtor or the debtor in possession . . . and
>
> "(B) such party does not consent to such assumption or assignment."

It is clear that contracts for personal services fall within (c)(1)(A), since "applicable law" excuses the parties from accepting performance from, or rendering performance to, non-signatories.

Thus, § 365(a) permits a trustee to *assume or reject* any executory contract, but

§ 365(c) adds the limitation that a trustee may not *assume or assign* an executory contract for personal services unless the parties consent.

On its face, the statute places no restrictions on a trustee's right to reject a personal services contract. This is not in the least surprising, since, as we read the statute, it implicitly provides that any executory contract which is not assumed—either in the course of the proceedings, or in the reorganization plan approved by the court—is automatically rejected. *See* 11 U.S.C. § 365(g)(1).

Appellant argues that this straightforward reading of the plain language of § 365 is inappropriate, because it does not take into account other provisions of the Bankruptcy Code, most notably § 541(a)(6) which, in defining "property of the estate," makes clear that the proceeds of the debtor's post-petition personal services are excluded from the estate. Since an executory contract for the debtor's personal services is not part of the estate, the argument continues, such a contract is not within the "jurisdiction" of the trustee, and the trustee simply has no power to deal with such a contract. This line of argument rests upon some fundamental misconceptions.

 To the extent that money is due the debtor for pre-petition services under a personal services contract, the debtor's claim for those sums is undoubtedly an asset of the estate which passes to the trustee/debtor-in-possession. And this is so regardless of whether the trustee later affirms or rejects the contract. Stated otherwise, the issue of affirmance or rejection relates only to those aspects of the contract which remained unfulfilled as of the date the petition was filed. It serves no useful purpose to speak generally about whether "the contract" becomes part of "the estate". The real question is the status of the reciprocal rights and obligations of the contracting parties arising after the petition was filed. As to these, the "assume or

---

**3.** The assertion that the debtor lacked a true intent to reorganize is not borne out by the record. Presumably a proposed plan of reorganization will emerge in due course, or the alter-

native of dismissal or conversion resorted to. No issue of undue delay is presented at this stage.

reject" dichotomy means simply that if the trustee wishes to obtain for the estate the future benefits of the executory portion of the contract, the trustee must also assume the burdens of that contract, as an expense of bankruptcy administration (*i.e.*, having priority over all pre-bankruptcy claims of creditors).

It is simply a *non sequitur* to suggest that a trustee may not reject an executory contract because it is not property of the estate. It is the trustee's decision (whether to assume or reject) that determines whether the benefits of an executory contract will or will not become property of the estate. And that decision is obviously within the power ("jurisdiction") of the trustee.

Personal services contracts differ from other executory contracts only in that the consent of the parties is required before the trustee has authority to assume them—a qualification which reflects the peculiar nature of such contracts and the widespread distaste for involuntary servitude. On the other hand, the trustee's authority to reject extends to all executory contracts—including personal-services contracts.

When an executory contract is not assumed (is rejected), 11 U.S.C. § 365(g) provides:

"(g) ... The rejection of an executory contract ... constitutes a breach of such contract ...

"(1) if such contract or lease has not been assumed under this section or under a plan confirmed under Chapter 9, 11 or 13 of this title, immediately before the date of the filing of the petition ....

Appellant has a claim against the debtor's estate for whatever damages the rejection/breach has occasioned. This claim, like the claims of other creditors, will have to be dealt with in the reorganization plan.

The parties' research has uncovered only two reported decisions directly pertinent to this appeal. In *In re Noonan,* 17 B.R. 793 (Bky.S.D.N.Y.1982), the court permitted the trustee to reject an executory personal-services contract in a Chapter 11 proceeding which had been voluntarily converted to a Chapter 7. In *In re Carrere,* 64 B.R. 156 (Bky.C.D.Cal.1986), the court ruled that a debtor in possession or trustee has no "standing" to reject a personal services executory contract (since the "trustee has no interest in the contract, he has no standing to act at all under § 365", 64 B.R. at 159). In *Carrere,* a TV actress contractually committed to perform in a daytime serial program was offered a more lucrative role on another program, and the court found that the sole purpose in filing for bankruptcy was to enable her to reject her existing contract and accept the new offer, in order to improve her financial position—a purpose not compatible with the true aim of the bankruptcy law. It seems probable that the principal basis for the court's decision was its conclusion that the bankruptcy proceeding itself might well have been dismissed. At any rate, for the reasons already discussed, we reject the notion that a trustee lacks power to deal with personal-service contracts.

The remaining issue is whether this particular executory contract was properly rejected. Since we are dealing with a personal-services contract which could not be assumed without the parties' consent, and which would therefore, sooner or later, be deemed rejected in the absence of such consent, the debtor-in-possession was confronted with an extremely limited choice: he could reject the contract, or he could defer decision pending formulation of a plan of reorganization—in case the parties might change their minds and consent to assumption of the contract in the plan itself. In these circumstances, the traditional "business judgment" test of benefit to the estate, *see, Sharon Steel Corp. v. National Fuel Gas Distrib. Corp.,* 872 F.2d 36, 39–40 (3d Cir.1989) has only limited application. We have no hesitation in concluding that no useful purpose would have been served by delaying the rejection decision. Indeed, the task of formulating a successful reorganization plan is undoubtedly aided by promptly clarifying the potential availability of some or all of the revenues from the debtor's post-petition creative efforts.

### IV. *Conclusion*

The district court properly decided that the Bankruptcy Code permits a debtor-in-possession to reject an executory contract for personal services, with court approval; that rejection of appellant's contract was appropriate; and that the bankruptcy proceeding should not be dismissed. We affirm those rulings. To the extent the appeal challenges the refusal to abstain, the appeal is dismissed.